NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

EXCHANGE PARTS COMPANY, Respondent.

No. 19106.

United States Court of Appeals
Fifth Circuit.

June 22, 1962.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Alfred Brummel, Atty., Stuart Rothman, Gen. Counsel, Rosanna A. Blake, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Karl Mueller, Harold E. Mueller, Mueller & Mueller, Fort Worth, Tex., for respondent.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case presents the question whether it is an unfair labor practice for an employer to announce benefits to employees shortly before a representation election.

In the absence of objective evidence of any taint of restraint or coercion by the employer, the benefits not being conditioned on the employees' renunciation of their right to organize or of any other rights, we hold that the announcement of employee benefits is not an unfair labor practice even if timed to have a persuasive effect on the election.

The Exchange Parts Company of Fort Worth, Texas, rebuilds automobile parts. Before November 1959 its employees were not represented by a union. November 4 the Company mailed to each employee a letter stating that its officials had recently returned from an industry conference at which "a great deal of emphasis was placed on *employee welfare*". The letter invited the employee and his wife to a dinner that night or the following night to discuss information important to the employees. At the dinners held November 4 and 5 C. V. McDonald, the vice president and general manager of Exchange Parts, announced that the 1959 floating holiday would be the day after Christmas and that the employees would receive an additional floating holiday during 1960. November 9 the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL-CIO, wrote the respondent that it represented a majority of the employees and requested a meeting to discuss contract terms. A week later the Union petitioned the National Labor Relations Board for a representation election. The Board held a hearing on the petition December 29 and issued an order February 19, 1960, scheduling an election March 18.

At the annual Christmas party in December McDonald did not announce the date of the 1960 floating holiday. He testified that at that time the Company was investigating whether it would be feasible to allow each employee to take the holiday on his birthday. Around January 1 the study was completed. The Company concluded that the birthday holiday was feasible and allowed the employees to vote on whether they would prefer it to a regular floating holiday. Since the only available place where the Company could hold an unsegregated meeting of all its employees, the Pioneer Palace, was unavailable in January, the dinner meeting was delayed until February 25. At the meeting the employees voted in favor of the birthday holiday. McDonald spoke during the meeting about the pending representation election. He said that the Union organizers had twisted some of the facts around to put the Company in a bad light; he pointed out the many benefits that the Company had given the employees, and he concluded by urging all the employees to vote in the election.

March 4 the Company wrote the employees asserting that they did not need a Union to obtain additional improvements in the future and asking the employees to vote against the Union. The letter announced as a benefit added in 1960 a new method for calculating overtime in the weeks containing a paid holiday. Under the old system the workers were paid for the hours not worked on the holiday but these hours were not included in the calculation of the workers' overtime earnings; since the regular work week included several overtime hours the employees did not earn as much in a holiday week as in a regular week. The new system gave the workers overtime as well as base rate credit for the holiday and thus removed the reduction in overtime pay. In announcing the change the letter stated, "This will mean $5 to $6 more per employee per holiday." Exchange Parts argues that this new overtime pay system was not introduced by the March 4 letter but

instead was initiated July 4, 1959. The system was used that holiday and the Company announced that this was in accordance with company policy, but it did not state clearly that the policy would be followed for subsequent holidays. The Union argued that the system was used then because July 4 fell on a Saturday when the employees normally work only half a day and therefore would not receive a full paid holiday. The new overtime system was not used for later holidays during 1959, which McDonald attributed to an error on the part of the accounting department. McDonald said that it was also an error that the new system was listed as a new benefit added during 1960 in the letter sent to the employees March 4, 1960.

The March 4 letter also stated that a new vacation system had been adopted during 1960 which would allow the employees to take an additional one and one-half days vacation. Before 1960 each employee was required to take his week of vacation during a regular pay week, beginning Friday morning and ending Thursday evening. The men were paid Friday for the preceding work week. At the end of 1959 the Company shifted the pay week forward one day to give the accounting department an extra day for making up the pay checks before distribution on Friday. The Company then decided to abandon the requirement that a worker's vacation week coincide with the pay week, which with the new pay week would have scheduled the vacations from Thursday to Wednesday, and to allow employees to take a calendar week vacation. The change gave the employee a week-end at each end of his vacation and allowed him to be away for a longer time, although it did not grant him any actual increase in his paid vacation. The Company asserted that it established this policy at the start of 1960 and that during February certain employees took vacations on the new basis. The March 4 letter was, however, the first general announcement to all the employees of this new policy.

## I.

The parties hotly dispute whether the birthday holiday, the holiday overtime pay, and the change in vacations represent an effort by Exchange Parts to influence the representation election by an increase in employee benefits just before the voting. The hearing examiner found that in 1955 Exchange Parts established its first paid holiday and announced that it would add an additional paid holiday each year. In 1958 there were four paid holidays. Early in 1959 McDonald announced that another paid holiday would be granted as a floating holiday. November 4 and 5 he announced that the new 1959 holiday would be the day after Christmas and also stated that in 1960 a sixth holiday would be added. Since there was no evidence to indicate that the Company knew of the Union's organizational campaign at that time, these findings clearly negate any inference that the sixth holiday was added as a result of the representation election or in an attempt to influence its outcome. The trial examiner found, however, that the announcement of the holiday was timed to influence the election. He stated, "I see no reason why McDonald could not have followed custom and announced the holiday at the Christmas party, or at least informed the employees the birthday holiday was then under consideration." He also questioned why the announcement of the plan for the birthday was delayed until the February 25 party.

We are unable to accept the imputation of blame to the Company on this point. There is no basis for the examiner's finding that McDonald should have announced the 1960 holiday at the Christmas party, since McDonald already had made that announcement November 4 and 5. Nor is there any rational basis for the hearing examiner to conclude that McDonald was under an obligation to announce at the Christmas party that the birthday holiday was under consideration, under pain of an examiner and the Board concluding that such omission amounted to interference with union organization. On the contrary, it

seems reasonable to us for the Company *not* to make an announcement about the birthday holiday that might stir up employee hopes and expectations until it had determined that the holiday was economically feasible. Finally, we can see no adequate basis for attributing an improper motive to the delay in the announcement until February 25, in view of the finding that a January meeting was not possible because of the unavailability of the Pioneer Palace. Such speculations do not reach the dignity of findings. See N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406.

## II

The story takes a different turn when we come to the holiday overtime pay and the vacation period. In its March 4 letter the Company announced both of these as new benefits added in 1960. This letter by itself constitutes substantial evidence of the creation of these benefits. The only question Exchange Parts raises relates to the timing; the employer asserts that the new overtime pay was established in 1959. This assertion, to say the least, is not so overwhelming that it compels acceptance as a matter of law. One might well raise an eyebrow over the contention that both the accounting department and those responsible for drafting the March 4 letter would have made such errors, and that the errors would have gone unnoticed, if the Company really had established the increased overtime pay as a permanent policy July 4, 1959. The new vacation week system may not be of prime importance but is a significant fringe benefit. It is a rational inference from the record that the new system was introduced in 1960 and announced generally for the first time in the March 4 letter. This is not the whole story, however.

The list of benefits in the March 4 letter shows that Exchange Parts, over the years, increased employee benefits as a regular matter of course. This and the announcement in the November 4 letter that the Company was anxious to do more to increase employee morale would have

justified the fact-finder in concluding that the institution of new benefits was not caused by the pending representation election. On the other hand the hearing examiner could have believed that these new benefits were greater than they otherwise would have been. The Company's March 4 letter itself stated that the employee benefits were increased twenty per cent by the additions within the past year. The fact that these new benefits were announced just two weeks before the election in a letter urging the employees to vote against the Union indicates that the benefits were part of the Company effort to oppose the Union. An issue of fact was presented with substantial evidence on either side. In such a case the factual determinations fall to the hearing examiner and the Board, since the demeanor of the witnesses and subtle bits of evidence developed during the trial can be decisive. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Washington, V. & M. C. Co. v. N. L. R. B., 1937, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965. We therefore accept the hearing examiner's and the Board's finding that as to the holiday overtime pay and the vacation period Exchange Parts increased its employee benefits with an intent to influence the outcome of the representation election. This poses squarely the legal question whether such action necessarily constitutes an unfair labor practice as defined and prohibited by 29 U.S.C.A. § 158(a) (1).

The Board itself has said, "We do not mean that an employer is foreclosed from announcing or granting economic benefits during a union's organizational campaign or during the pendency of a Board-ordered election." Matter of Hudson Hosiery Co., 72 NLRB 1434 (1947). But the test stated in that decision is a fuzzy, subjective one: "What is unlawful under the Act is the employer's granting or announcing such benefits (although determined upon bona fide) *for the purpose* of causing the employees to accept or reject a representative for collective bargaining." (The Board's emphasis.)

Taking the other extreme, the Board has also said:

"It is well settled that the test of interference, restraint, and coercion under Section 8(a) (1) of the Act does not turn on the employer's motive or on whether the coercion succeeded or failed. The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act. Applying this test, we find that by announcing its change in overtime policy during the course of the organization campaign among office employees, the Respondent violated Section 8(a) (1) of the Act." American Freightways, Inc., 124 NLRB 146 (1959)

See N. L. R. B. v. Illinois Tool Works, 7 Cir., 1946, 153 F.2d 811, 814; N. L. R. B. v. Ford Brothers, 6 Cir., 1948, 170 F.2d 735, 738. Here, the Board seems concerned solely with the *effect* of the timing of the announcement of the benefits. We find, from our study of the cases, that the courts do not accept any of these tests. The proper criterion is whether there is objective evidence of restraint or coercion, such as conditioning the benefits on the employees voting against the union or relinquishing rights of self-organization.

None of the cases we have examined presents as cleanly as this case the question of the right of an employer to grant benefits timed to achieve the persuasive effect that a union is unnecessary. Certain decisions hold the employer guilty of an unfair labor practice, but in all of these cases the increase in benefits was one part of an overall program of interference and restraint by the employer. On the other hand, at least three decisions hold that the employer was justified in increasing benefits and that this did not constitute a Section 8(a) (1) violation; in these, however, there was definite evidence indicating that the employer would have made the increases in the absence of the pending election. A consideration of these cases sets the frame of reference for the question raised by the instant case.

In Medo Photo Supply Corp. v. N. L. R. B., 1943, 321 U.S. 678, 686, 64 S.Ct. 830, 88 L.Ed. 1007 the Supreme Court laid down the principle that the "action of employees with respect to the choice of their bargaining agents may be induced by favors bestowed by the employer as well as by his threats or domination." That principle must be applied in context, however. In Medo the Court applied it to an employer who granted wage increases conditioned on the employees abandoning a labor union previously designated as their bargaining representative.

One of the early cases indicating that it is improper to confer benefits on the employees to encourage opposition to a union is Western Cartridge Co. v. N. L. R. B., 7 Cir., 1943, 134 F.2d 240, 244. There the court made the frequently quoted statement that "interference is no less interference because it is accomplished through allurements rather than coercion." Again the facts differ considerably from those of the instant case. The company had required each employee to sign an individual employment contract. It had also encouraged the establishment of a union that was unaffiliated with any larger union organization and that dealt with matters not covered by the individual employment contracts. When an A. F. of L. union attempted to win recognition in the plant the company opposed it vigorously and urged its employees to stick with the unaffiliated union. The court held that the company dominated the unaffiliated union and that its open hostility to one union and support of another violated the unfettered freedom of choice that the Act intended for the employees to have. The "interference by allurements" in this case represented the support of a competing union rather than any benefit directly conferred on the employees, contrary to the Midwest Piping rule, 63 NLRB 1060 (1945). See Local 483, Inter. Bro. of Boilermakers, etc., v. N. L. R. B., 1961, 109 U.S.App.D.C. 382, 288 F.2d

166, cert. denied, 368 U.S. 832, 82 S.Ct. 55, 7 L.Ed.2d 34.

In N. L. R. B. v. Crown Can Co., 8 Cir., 1943, 138 F.2d 263, the employer warned his employees at a meeting that if they insisted on pushing the organization the plant would be closed. At the end of the meeting he said, "If it is a wage increase you want I will see what I can do about it." Four days later there was a general wage increase. The Board found that these actions illegally restrained and coerced the employees. In such a case coercion results from the squeeze in which the employees are placed. They are faced with a dilemma. If they reject the union they can retain their jobs and enjoy increased compensation; if they vote-in a union they are threatened with losing the increased benefits and their jobs as well. The increase in benefits operates as a part of an overall scheme that puts substantial pressure on the employees and prevents them from exercising a free choice as to whether they wish to establish a union.

N. L. R. B. v. West Coast Casket Co., 9 Cir., 1953, 205 F.2d 902 closely resembles the Crown Can case. Here also the employer threatened that "if it went union, he would close the plant" and during the union's organization campaign announced new economic benefits; the employer announced the new benefits to various employees while interrogating them about their union sympathies. Here, as in Crown Can, the combination of the employer's acts tended to present each employee with the choice that he could go along with the employer or with the union but that he could not receive benefits from the employer and also exercise his right to organize a union.

■ A bare promise of future benefits is distinguishable from actual establishment of benefits; in some cases it is a fair inference that the benefits are contingent on a rejection of the union. It is well established that an employer cannot offer wage increases conditioned on the employees withdrawing from or voting against a union. Medo Photo Supply Corp. v. N. L. R. B., 1944, 321 U.S. 678, 63 S.Ct. 830, 88 L.Ed. 1007; Joy Silk Mills v. N. L. R. B., 1950, 87 U.S. App.D.C. 360, 185 F.2d 732, cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350; N. L. R. B. v. Bailey Co., 6 Cir., 1950, 180 F.2d 278; M. H. Ritzwoller Co. v. N. L. R. B., 7 Cir., 1940, 114 F.2d 432.

A recent case, N. L. R. B. v. Katz, 1962, 82 S.Ct. 1107, should also be mentioned briefly. In this decision the Supreme Court held that it was a violation of the duty to bargain collectively, imposed by Section 8(a) (5), for an employer, without consulting a union with which it was negotiating, to grant merit increases, wage increases, and announce a more generous sick-leave policy. There, however, the company was in the middle of bargaining negotiations and the changes were matters subject to mandatory bargaining. Such unilateral changes were a circumvention of the duty to negotiate "which frustrates the objectives of Section 8(a) (5) much as does a flat refusal."

Judge Thurman Arnold was one of the first to emphasize that an employer is not guilty of an unfair labor practice "because he treated his employees well in order to forestall a union movement," or because he reminded them of that fact, claimed credit for it during a period of a union election, and even increased wages during an election period. Peter J. Schweitzer, Inc. v. N. L. R. B., 1944, 79 U.S.App.D.C. 178, 144 F.2d 520. In that case, just before an election, the employer sent a letter to the employees and during the election campaign put into effect a general wage increase. The letter implied, or might have implied, reprisals or a denial of past benefits if the employees voted for the union. The Court therefore enforced the Board's cease and desist order but only "so far as it requires the petitioner to assure its employees that the benefits it is giving and the liberal labor policy it has adopted will not be changed because they vote for a union." The Court explained:

"We cannot agree * * * that an increase in wages or an improve-

ment in working conditions made during an election period is an unfair labor practice provided there is no suggestion that these benefits would be withdrawn if a union is organized. Such a principle would mean that it is the duty of an employer to refrain from benefiting his employees in order to make them more inclined to vote for a union."

The first case we have found in which a court declined to enforce an order of the Board and approved the grant of benefits during a union campaign was N. L. R. B. v. W. T. Grant Co., 4 Cir., 1953, 208 F.2d 710. In ruling that the wage increase was not improper the Court relied on uncontradicted testimony that the increase was not considered until the store manager learned that a rival store in the same block planned to raise its wage level and that W. T. Grant made a point of paying its employees as well as any neighboring store. The Court stated, "Certainly it cannot be laid down as a governing rule that during a union campaign, management must deny to its employees increased advantages which in the absence of the campaign would be granted." Similarly, the Court in N. L. R. B. v. Cleveland Trust Co., 6 Cir., 1954, 214 F.2d 95, 100, held that it was not improper for the company to increase wages before a union election when the reasons for the increases did not relate to the election. A contrary principle "would mean that it is the duty of the employer to refrain from benefitting his employees in order to make them more inclined to vote for a union." This Court reached the same result in N. L. R. B. v. The Newton Company, 5 Cir., 1956, 236 F.2d 438.

The statute under which the N. L. R. B. issued its cease and desist order, 29 U.S.C.A. § 158(a) (1), provides that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." Section 157 grants employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The terms "interfere with, restrain, or coerce" have closely overlapping meanings and connotations. We understand the three terms to encompass one general group of activities, rather than to set out three separate categories. Each term must therefore be construed with a view to the implications of the other terms. These words, especially "restrain" and "coerce" are strong ones, which carry a suggestion of force and compulsion. The pertinent dictionary meaning of "interfere" is "to come in collision; to clash; also, to be in opposition; to run at cross-purposes * * * to enter into, or take a part in, the concerns of others; to intermeddle; interpose; intervene." "Restrain" is defined as meaning "to keep in check; to hold back from acting, proceeding, or advancing, either by physical or moral force, or by any interposing obstacle; to repress or suppress; to curb." The definition given for "coerce" is "to constrain or restrain by force, esp. by law or authority; to repress; curb." Webster's New International Dictionary (2d Ed. unabridged, 1958). The dictionary meanings coincide with the common meanings. We note that these terms stand in contrast to such terms as "persuade" or "induce" which would also describe conduct designed to influence the actions of another but by non-compulsive means.

This provision has been liberally construed. As the court stated in Rapid Roller Co. v. N. L. R. B., 7 Cir., 1942, 126 F.2d 452, 457, "it is not necessary to show duress but only interference, and it is not necessary that the interference shall be successful in preventing organization." The provision has been used to prohibit a multitude of sins: a threat by an employer that he would not rehire any employees who went out on strike, Collins Baking Co. v. N. L. R. B., 5 Cir., 1951, 193 F.2d 483; anti-union interrogation of employees and requests

that they withdraw from the union, N. L. R. B. v. Economy Furniture, 5 Cir., 1960, 284 F.2d 339; threats by employer that he would close down the plant before it would have a union and the discriminatory discharge of employees because of their union activities, N. L. R. B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88; constant surveillance of an employee after the employer has learned of his union activities, N. L. R. B. v. Gate City Cotton Mills, 5 Cir., 1948, 167 F.2d 647, 649. All of these employer actions proscribed by the statute bear the identifying feature of a threat or an act to punish the employees for their union activities. The statutory purpose is to protect the worker from such employer pressures and enable him to decide whether he wishes to join and support a union without the fear that his decision to do so will jeopardize his relations with his employer. Decisions enjoining an employer from making a promise of benefits are consonant with this purpose, since such promises exert a similar pressure on the employees: they may exercise their union rights only by sacrificing employment benefits. The promise of a benefit for abstaining from union activities is a more moderate device than the threat of punishment for participating in union activities, but its operation is essentially the same.

The announcement of new benefits by Exchange Parts in the instant case differs tellingly from the actions prohibited by this wide range of cases. Here the benefits were put into effect unconditionally on a permanent basis, and no one has suggested that there was any implication the benefits would be withdrawn if the workers voted for the union. The employees were as free after the establishment of the new benefits as they were beforehand to vote for or against the union according to their own wishes, untrammelled by considerations of the impact their decision would have on their job security, compensation, or relations with the employer. Of course, we regard as vital the fact that the benefits were announced before the certification of the union as the bargaining agent of the employees. If, on the other hand, the employees had previously selected a union as their representative, as in N. L. R. B. v. Katz, the employer's unilateral changes would have been a serious interference with orderly procedure in the collective bargaining process.

The argument that an increase of benefits by the employer may persuade the employees not to vote for the union overlooks the fact that the employer is entitled to try to persuade his employees to vote against a union, provided that he does so by non-coercive means. "Anti-union bias, strong convictions against unions or opposition to the underlying philosophy of the Labor Management Relations Act is not itself an unfair labor practice. In a free democracy, it is the citizen, not the Government, who fixes his own beliefs." N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 409. The right of the employer to make his appeal to the workers is expressly preserved by the statute. "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. A. § 158(c). Although freedom to increase benefits in an effort to make a union seem unnecessary does not follow as a necessary incident of the right to argue against the union, it is scarcely any more coercive. Also, although the limitation on the expression of views to exclude a threat of reprisal or force or a promise of a benefit is not in terms an exclusive limitation, it is significant that this is where the authors of the provision chose to draw the line. The whole tenor of the statutory language and decisions interpreting it indicate that the evil to which the statute is directed is the use of force and pressure. Persuasive efforts are not outlawed. Testing the increase of benefits effected by Exchange Parts against these considerations, we

feel that this action is persuasive, not coercive.

Practical considerations support this result. We would be reluctant to announce any sort of a rule that inhibited employers from improving working conditions, increasing wages, and reducing hours of labor. Unlike most actions of interference or coercion, an increase in benefits operates to the advantage of workers. It would be ironic if a labor law had the result of discouraging benefits for labor. The problem is intensified by the fact that in many cases it would be difficult—if not impossible—to determine whether an increase of benefits is made to discourage unionization or for other "legitimate" reasons. Labor would stand to lose not only where an anti-union motivation actually existed but also in some cases where the employer for other reasons wished to increase benefits but feared being charged with an

unfair labor practice. Extension of the statute's prohibitions to cover this sort of a case would thus act as a burden on both management and labor.

Summarizing, the critical fact in this case is that the benefits carried no coercive element; they were not conditioned upon the employees' relinquishment of any rights. The employees had, as the Act intended the employees to have, an unfettered right of self-organization, a free choice. It is impressive logomachy to turn "allurements" into "coercion" by divining a secret purpose. It is good, homey, country-lawyer advocacy to argue that a carrot on a stick may have the same effect on a donkey as a club. But a carrot is not a club. Labor is not a donkey. Persuasion is not coercion.[1]

Enforcement of the Board order is Denied.

1. In an analogous situation this Court held that even during bargaining negotiations an employer may engage in a lockout for the purposes of enhancing the acceptance of the company's terms rather than the union's terms. "A lockout may, under the facts of a particular case, amount to a violation of § 8(a) (1) or § 8(a) (3), or of § 8(a) (5) or all three. * * * But unless the facts support a conclusion of a violation, then resort to a lockout may not be made a violation simply on the ground that this gives advantage to the employer * * *." N.L.R.B. v. Dalton Brick & Tile Corp., 5 Cir., 1962, 301 F.2d 886. The Supreme Court has said as to Section 8(a) (3): "Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed." Radio Officers' Union, etc. v. N.L.R.B., 1954, 347 U.S. 17, 42, 43, 74 S.Ct. 323, 98 L.Ed. 455. Justice Harlan, concurring in a recent opinion, points out: "What in my view is wrong with the Board's position in these cases. is that a mere showing of foreseeable en-couragement of union status is not a sufficient basis for a finding of violation of the statute. It has long been recognized that an employer can make reasonable business decisions, unmotivated by an intent to discourage union membership or protected concerted activities, although the foreseeable effect of these decisions may be to discourage what the act protects. For example, an employer may discharge an employee because he is not performing his work adequately, whether or not the employee happens to be a union organizer. * * * Yet a court could hardly reverse a Board finding that such firing would foreseeably tend to discourage union activity. Again, an employer can properly make the existence or amount of a year-end bonus depend upon the productivity of a unit of the plant, although this will foreseeably tend to discourage the protected activity of striking. * * * A union, too, is privileged to make decisions which are reasonably calculated to further the welfare of all the employees it represents, non-union as well as union, even though a foreseeable result of the decision may be to encourage union membership." Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11.