NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TEX-TAN, INC., Respondent.

No. 19715.

United States Court of Appeals
Fifth Circuit.

May 24, 1963.

474

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, A. Brummel, Atty., N.L.R.B., Washington, D. C., Stuart Rothman, Gen. Counsel, James C. Paras, Atty., N.L.R.B., for petitioner.

Theo F. Weiss, San Antonio, Tex., L. Bruce Fryburger, San Antonio, Tex., Clemens, Knight, Weiss & Spencer, San Antonio, Tex., of counsel, for respondent and cross-petitioner.

Before RIVES, JONES, and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Board seeks enforcement of its Order holding the Employer guilty of violating § 8(a)(1) for threatened reprisals against employees by reason of union membership and a § 8(a)(5) failure to bargain in good faith. 29 U.S.C.A. § 158(a)(1) and (5). The latter covers charges of improperly declining to furnish information concerning the Employer's age classification scheme, unilateral increases of wages during negotiations, and an effort upon the part of the Employer to bypass the Union representatives in order to conduct bargaining directly with the employees. Except as to the charge of unilateral wage increases as to which the case is reversed and remanded for a retrial, we deny enforcement.

### § 8(a)(1) Threats

The § 8(a)(1) finding rests on separate episodes concerning two employees. One involves a remark made by a management representative to credit supervisor Orsak that Orsak's wife was seen wearing a Union button and this might prejudice Orsak's career. This was made shortly before the election resulting in the certification of the Union. The Board supplied what the Examiner omitted, that in all probability the husband communicated this to his wife so

that it was "manifestly intended to interfere with her continued support of the Union." The other involves a warning by a foreman to the employee Schaefer that unless she were to "ditch the union [she] would be the first one * * laid off." The brief in support of the Board's Order asserts that these two incidents (with the § 8(a)(5) violations) "constituted part of a clear pattern of conduct forbidden by the Act."

■ But the total record is convincing that the foreman's statement was neither meant nor understood to be a threat.[1] Nor as to Orsak is there any indication at all that he communicated the supposed threat either to his wife or to others. In a 1900-page record these are two isolated incidents which in the context of this particular setting did not reasonably warrant the inference that the distinct actions were discriminatorily motivated with a view of discouraging Union adherence or support in the forthcoming certification election.[2]

### § 8(a) (5) Disparagement of Bargaining Agent

■ The Board's Conclusion that the Employer's actions were an effort to bypass the Union as the authorized bargaining representative has little foundation. The charges rest on a letter sent by management to all employees on May 12, 1959, and a later suggestion that representatives of management and the Union's contract committee meet without "outsiders" to determine what were the real stumbling blocks to consummating an agreement.

The letter of May 12, 1959, had no discernible effect. Negotiations went on for a year later at least until June 8, 1960. All the letter did was to bring to the attention of each of the employees the Employer's views and contentions as to some of the bargaining proposals.[3] Neither by its terms, its implications, or the context in which it was sent or received did this communication contain any "threat of reprisal or force or promise of benefit." It was a permissible expression of views and opinions held by management. 29 U.S.C.A. § 158(c). N.L.R.B. v. Exchange Parts Co., 5 Cir., 1962, 304 F.2d 368; N.L.R.B. v. Superior Fireproof Door & Sash Co., 2 Cir., 1961, 289 F.2d 713.

That there should even be a complaint, much less a holding, of a § 8(a) (5) violation as to the direct contact between management and the local bargaining committee is not a little surprising. By undisputed evidence it was motivated (and accepted) out of a mutual desire to achieve the law's end—industrial peace through contracts voluntarily entered into. This took place in March 1960. Beginning in April 1959, a total of 29 bargaining sessions were held between then and June 8, 1960. After 16 sessions in 1959 a contract was agreed on between the Employer and the International Vice President Twedell. Unfortunately, the membership, as required by the Union constitution, declined to approve it. Fur-

---

1. The employee concerned was not discharged, and the reference, as the employee knew, was to her own recent experience in which because of her relative abilities, she had been retained while a person senior to her was laid off. No one disputes the accuracy of the foreman's prediction that if the Union were certified, lay offs would be in accord with strict seniority.

2. N. L. R. B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511, 516; N. L. R. B. v. Dalton Brick & Tile Corp, 5 Cir., 1962, 301 F.2d 886, 898; N. L. R. B. v. Armour & Co., 5 Cir., 1954, 213 F.2d 625, 628; N. L. R. B. v. Grunwald-Marx, Inc., 9 Cir., 1961, 290 F.2d 210.

3. The letter stated that "Many provisions * * * would make it very difficult or impossible for the Company to carry on its business in a competitive and efficient manner." It referred to a 10-week old strike going on in San Antonio (in an unidentified business), and it expressed the hope that "the same situation * * * will not be the case in Yoakum." With no disparagement of the Union, threats expressed or implied, it ended with the laudible assurance that the "Company is still interested in you and your family" and invited any employee "to talk to any of us about these matters at any time * * *."

ther bargaining resumed with sessions on January 28 and February 23. Prior to the March 9 bargaining session, the industrial relations manager of the Employer approached Neusser, an employee member of the bargaining committee, to ask whether the employee bargaining committee would meet with Employer's officials, without any outside representatives—that is, non-employee Union representatives or the Employer's counsel and chief negotiator—being present.[4]

But up to this point it was a request and nothing more. Presumably the employees' bargaining committee thought well of the idea for Neusser made an effort to obtain permission from Horton, the local business agent. No meeting was held until Horton himself authorized it. Later meetings were held without again seeking express permission as all thought, and the Examiner found, that the Union had consented to it. It was clearly understood by all that the meetings were to exchange views and no commitments could or were to be made.

■ The Examiner was hard pressed to find anything wrong with this. It, like the May 12, 1959, letter was characterized as "likewise having a tendency to disparage and undermine the Union's bargaining position." But of the Employer's "invitation to the employee members of the bargaining committee * * * to meet * * * without the presence of outside union or company representatives, for the purpose of discussing subjects about which the parties had been unable to agree," the Examiner with much wisdom remarked: "It is not that the latter idea should be criticized." Indeed, the Examiner continued, "the Union itself, in * * * giving its consent to such meetings, apparently welcomed this approach as a possible way of settling the

differences." Then in a complete non sequitur what was good, wholesome and thought by all to be a means of resolving controversy suddenly became the "vice in [the Employer's] action." This vice, the Examiner stated, was the Employer's "failure first to ask the designated bargaining representatives' permission to try such an approach." But under § 7, 29 U.S.C.A. § 157, the right accorded to employees is "to bargain collectively through representatives of their own choosing." These representatives included the members of the employees collective bargaining committee and the Business Agent Horton. Apart from his status as the chosen representative of the employees, Parr had no such standing as to be able to veto every proposal which originated with some other person. In the approach seeking permission to have the discussions or in the discussions themselves there is not the slightest inkling of a purpose to undermine the Union to subvert its employee members or to disparage its negotiations. No one reasonably in this context could have concluded that such was either its purpose or its probable effect. N.L.R.B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511.

### § 8(a)(5) Refusal to Furnish Wage Information

■ The Examiner, and later the Board by overruling vigorous exceptions by the charging Union (and in part the General Counsel) held that the Employer was not guilty of a § 8(a)(5) failure to bargain in good faith in not furnishing information as to wage *standards*. Notwithstanding this, each held that there was such a failure to supply information as to job rate *classifications* and the *classification rate* changes made in March-April 1960. While there is a technical distinction between "standards" and

4. It was not intended to supplant negotiations as "the whole idea was an attempt to get together to find out what the problems were between management * * * and the Union to see what were the stumbling blocks between them." Union representatives had previously demanded that the Employer's counsel and

chief negotiator be kept out. And if the Union negotiator Parr's actions during bargaining is similar to his conduct as a witness, it is easy to understand how the Employer might feel that his presence was a hindrance to successful peaceful bargaining.

"classification" in the Employer's wage structure, the record, in our judgment, does not support a finding that there was a failure to furnish information as to one, but not the other.[5]

The Employer is a manufacturer of leather goods in six production factories—the Belt, Billfold, Saddle, Moccasin, Tannery, and Tree Factories. For the various operations, its labor force is paid on (a) piecework or (b) time rate, or occasionally both. Most of the work in the production factories was on the incentive piecework wage plan. The "Standard Hour incentive wage plan" has two factors, (1) the standards[6] and (2) classification.[7]

There were also time-rated jobs (in whole or in part) by which time rates were divided into six groups.[8]

The Examiner's Report discusses in great detail the intricate structure of the Standard Hours.[9] The Examiner traced the actions of the Union representatives and that of the Employer in the request for data and that furnished. Beginning in April 1959 and running through the end of negotiations, the Employer supplied a considerable body of figures, papers, copies of Standards, etc., and it made an unqualified offer to the Union for its representatives to see and copy any of its records and obtain whatever other information it desired. An event of considerable importance was an inspection in the plant by a technically trained time-study engineer on the staff of the International Union. He and the star negotiator were received with lavish cordiality and full cooperation. They stayed as long as they wished, saw what they desired, and asked all of the questions they had. In the meantime, however, the Union continued to demand that the information had to be furnished in an organized fashion—largely for the very reason that it was so intricate, complex, and voluminous.

The Examiner[10] expressed this categorical conclusion. "I find no basis on

5. We recognize that the duty to bargain in good faith encompasses the duty to furnish information. N. L. R. B. v. Item Co., 5 Cir., 1955. 220 F.2d 956; Sinclair Refining Co. v. N. L. R. B., 5 Cir., 1962, 306 F.2d 569, 571, n. 3.

6. The Examiner, crediting an Employer's bulletin, describes the Standard Hour as a "unit for measuring human labor" which "represents the standard amount of effective effort which is reasonable to expect from a worker during one hour by a normal operator working at a normal rate of speed under normal working conditions. This includes an allowance for fatigue and personal needs." It is expressed in terms of decimal hours of so many Standard Hours per 100 units, or per 10 units in case of saddles. Time and motion studies are made of each operation (called "elements") as to the steps or movements in any operation. Thus for 100 units, e. g., belts, the Standard might prescribe 2.110 hours.

7. In order to determine how much money is due for the time prescribed by the Standard Hours per 100 units, the base hourly rate of pay for the particular job must be prescribed. This is covered by the so-called *classification*. There were 8 classes running through Class 1 to 8. Class 1 base rate was $1.03 per

hour; Class 8 $1.20 per hour. Class 9 and 10 were added by the wage increases of March-April 1960 discussed infra.

The Employer in determining classification for a particular job used a so-called point system in which it assigned point values for factors such as skill, time needed to acquire the skill, difficulty of the job, fatigue, heaviness of the work, finger dexterity, etc.

8. Classes A through F with each class in turn having a number of stations. These "stations" were for advances within a class, some were automatic after a period of service, others on merit based upon the Employer's judgment as to the value to be assigned to such factors as experience, mental effort, physical effort, etc.

9. With 300 to 350 new items a year, totaling some 1800 items in production, the Employer had over 4500 standards in existence and over 1500 to 2000 were in operation each week. Every change in style or method of performing an operation or suboperation brought on changes or revision in Standard Hours. As constructed each Standard might have 4 to 15 separate sheets of paper.

10. The Report first points out that the General Counsel by his brief disclaimed "any contention that [Employer] has a duty to photostat or otherwise duplicate

the record before me for concluding that [the Employer] has refused to * * *" make reasonable arrangements for union examination of such records.[11] This was made doubly plain by this critical legal finding. " * * * I find that the General Counsel and Union have not established that [the Employer] refused to bargain in good faith by failing to furnish the detailed standards information requested."

But then, oddly enough, the Examiner found that the Employer had failed to furnish "all of the job rate classification information requested." This requested information concerned "the points assigned to each factor considered in placing jobs under their respective classifications." (See note 7, supra) After first stating that these points were not too voluminous, and did not involve the intricacies of the Standard Hours records, the Examiner theorized that "apparently" the Employer's "only explanation for not supplying the information was that its point evaluation system was scientifically set up and that the union representatives probably would not be able to understand it."

■■ We could agree with the conclusion immediately thereafter expressed by the Examiner that "I do not regard this explanation as a valid excuse for [the Employer's] failure even to attempt to present and explain its system," if that were really sustained by the record. But a reading of this entire record with its hundreds of pages of questions and answers, shows two things when the record is considered, as it must be, as a whole. 5 U.S.C.A. § 1006. First, all

were aware that in take-home pay to the individual employee, all of the proposals required a consideration both of Standard Hours and the classification. In seeking comparative information of the present and preceding year or months, all of it was inexorably bound up together. The unqualified offer which the Examiner credited as to Standard Hour information encompassed this as well. Second, and perhaps even more important, with unlimited access to all of the Company's records,[12] there is not yet the slightest indication that there exists any separate records, papers, or documents which reflect the judgment factors which led representatives of the Employer to put one particular job in one, rather than in another, classification. True, reference was occasionally made to it being "scientific" and perhaps too difficult for the Union people to understand. But it is plain from the whole record that these so-called point values covering factors such as skill, etc., were just subtle factors of management judgment. How and to what extent any one or all of such factors resulted in the classification of an operation in one, rather than in another class, were matters primarily residing in the minds of management personnel responsible for these decisions.[13] The Union's time engineer had access to all records and all ears of the Employer. While statements of various witnesses here and there might literally indicate that such information requested was not furnished, it is inconceivable on the record as a whole that the Employer would, as the Examiner and the Board credits, unqualifiedly extend every piece of its

the standards information requested by the Union" so long as it makes "reasonable arrangements with the Union so that it may be made available for them for intelligent examination or duplication by them." To this note 32 added "Cf. Southern States Equipment Corp., 124 NLRB 833; George Mick, d/b/a Yakima Frozen Foods, 130 NLRB No. 128."

11. The Report went on to state that the Examiner found on basis "for concluding" that the Employer "if requested, would have refused to make this informa-

tion available for inspection in an organized fashion or * * * would have refused to explain any of its records which might on their face be unintelligible to a union representative."

12. This included some 49 cartons of records produced in the hearing for unlimited examination by the Examiner and all of the counsel.

13. This is borne out by works manager Welhausen's testimony at J.A. 311, 332; and general manager Welhausen's at J.A. 547, 554.

most intricate and complex information to Union representatives and yet keep from them that which is much simpler in nature and structure.[14]

### § 8(a)(5) Unilateral Wage Changes March–April 1960

In assaying this aspect of the case, several things must be borne in mind. First, the formal written complaint (with formal bill of particulars furnished by the General Counsel) attacked changes in standards, classification, piece to time work, and vice versa, which were unilaterally made in 1959 shortly after certification of the Union. In view of the contentions of the Regional Director's office that such changes were illegal, the Employer froze all wage changes, and none of any kind were thereafter made up to March 7, 1960. The Examiner expressly sustained the propriety of the 1959 changes and held that in view of the intricacies of standards, classifications, etc., the Employer was not required to freeze its wage structure. Over vigorous exception of the General Counsel and the Union, the Board sustained these holdings. Second, the Examiner allowed an oral amendment charging § 8(a)(5) failure to bargain for alleged unilateral changes in March–April 1960. To this charge the Employer made, in effect, a dual answer: (1) all such changes were first discussed in negotiations with the Union before being instituted; and (2) when instituted, an impasse existed. As to these, the Examiner (and Board), after apparently rejecting the defense of impasse,[15] held that changes had been illegally made in March–April 1960. Third, and probably most important, when the Examiner's Report and the particular changes made are carefully analyzed in the light of the record, it is clear that the finding is very restricted. It shows that, at most, such changes are confined to increases in "the number of stations" applicable to "timeworkers" thereby "creating more opportunities for progressive rate increases." (See note 6, supra).

The Report itself reflects that most of the changes were held to be permissible. The Report states, "On March 7 and April 11, 1960, [the Employer] put into effect the reclassifications of both its piecework and time-rated employees which it *had theretofore offered* the Union in contract proposals, thereby effecting wage increase of 3 cents or more for its employees." (Emphasis added) As the Board found, most of these were the wage rates contained in the Twedell contract as to which there had been not only negotiation, but momentary, tentative agreement. Many others were part of the contract proposals of February

---

14. Within a month of the certification, the Union insisted, and the Employer acquiesced in, a "freeze" of any further changes in the Standard Hours system on the ground, as the Examiner described it, that the "Standard Hour system and its application were important subjects of collective bargaining." Of course, as described above, this system had two parts, (a) standards and (b) classification. But it was all one system, not two.

15. In the structure of the Examiner's Report under "8. Analysis and conclusions with respect to the refusal issues," this matter was dealt with in "c. Requests for information as to job rate classifications and the rate changes effected by Respondent in 1960." The Examiner lumped together the failure to furnish information "as to the points assigned" to classifications which we have held unsupported and the changes of March 7 and April 11 in the wage rates. After finding the Employer guilty on these blended charges, the Examiner makes this ambiguous statement:

"In concluding that [the Employer's] conduct described above is inconsistent with the requirements of good faith bargaining, I am aware of the fact that the Union's continued insistence upon being furnished with voluminous standards data, and its failure to take advantage of [the Employer's] offer at the March 9 bargaining conference to make all its standards data available to the Union at [the Employer's] offices, may well have precluded agreement being reached anyway. Nevertheless, I do not believe that such possibility or probability should relieve [the Employer] of its obligation to satisfy the requirements of good faith bargaining in other respects."

23.[16] While the Report finds that on February 23 two types of operations covering some 270 different jobs were excluded, this is of no final consequence.[17] In the first place the record, properly considered, shows that all jobs were covered by a universal 3¢ per hour proposed increase. Next, and more important, it is uncontradicted that prior to the institution of the changes, there was submitted to the Union proposed new classifications which included the increases made in April for the categories "machine edge and edge point" and "notch and stamp."

Except for the creation of additional job stations as to certain time-rated employees which we shall shortly discuss, all of the changes actually instituted in March–April 1960 had been the subject of prior extensive negotiations and discussions in the bargaining sessions. As to such wage changes, the Board's conclusion of § 8(a) (5) violation necessarily rests upon a finding that while the Employer did discuss these proposed increases it did not advise the Union of the *time* the proposed rates were to be instituted.[18] To be sure the record does not reveal a specific time which the Employer fixed as the target date. But, as the Report finds, it is undenied that in the session on February 23, 1960, the Employer's chief negotiator discussed at length the "chaotic condition" brought about by the Union-imposed freeze and the necessity for the Employer to institute new standards "at the earliest possible moment." The Report undertakes again to rely on the erroneous distinction between changes of "standards" and "classifications." But the record as a whole is convincing that the two were intertwined, and the Union was informed that in the immediate future the Employer would institute changes as a matter of economic necessity.

Except then as to the added stations for time-workers, the Employer had discussed both the nature and kind of wage changes and the general proposed timing of its actions. As to these proposals, the record does not permit, and the report of the Board does not find, that there were any improper conditions attached or ultimatums laid down. It was in no sense a "take-it-or-leave-it" proposition. It was, rather, a plain statement that the Employer for economic reasons had to make changes and that these specific changes were going to be made. In these circumstances, the Employer was not required as a matter of law to await either the formal rejection or acceptance of the proposals by the Union.[19]

16. The Examiner previously found that at the February 23 meeting, the Employer "offered to change its previous contract proposal that a pieceworker could receive 95 percent of his base rate if he achieved less than 90 percent of his standard; it proposed, instead, to make the base rate the guaranteed minimum rate." At the same meeting, it submitted a 35-page document which, the Report continued, "listed the old and new style number of each operation, its code number, the proposed new Standard Hour * * * and the proposed new classification. The list included 823 proposed new or changed standards."

17. The Report continued (see note 16, supra), "On the first page of the document it was explained * * * that all but two of the seven types of operations listed would carry an increased base rate.19" Note 19 stated the "excepted operations were 'machine edge and edge point' riding equipment and 'notch and stamp' riding equipment."

18. For example, see the Report: "In the meantime, on March 7, [the Employer] without any notice to the Union of its intention to do so, put into effect many of the base rate classification changes for piecework operations which *had been proposed* in prior contract offers." (Emphasis supplied).

Later on the Report, after describing the action of March 7 and April 11, 1960, stated: "It took these steps without any prior notice to the Union of its intention to do so."

19. Besides the strong expression of doubt that the proposals would have been accepted because of the wrangle over unfounded demand for production of information (see note 15, supra), the record also shows that the Union early expressed the wish that wage increases be instituted without awaiting final, total contract agreement.

■ ■ Of course, before instituting wage changes of a kind which constitute a subject of mandatory bargaining, there is the statutory duty to first "meet * * and confer in good faith * * *." § 8(d). But it is a mistake to assume that where there has been such discussion and fair notice of the employer's intended actions, it is a violation of the law to institute such changes without securing the agreement of the Union. In N. L. R. B. v. Crompton-Highland Mills, 1949, 337 U.S. 217, 224, 69 S.Ct. 960, 963, 93 L.Ed. 1320, the Court early recognized that "a unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining * * left unaccepted or even rejected in those negotiations * * * might well carry no disparagement of the collective bargaining proceedings. Instead of being regarded as an unfair labor practice, it might be welcomed by the bargaining representative, without prejudice to the rest of the negotiations. * * *" We expressed it in these terms. "Nothing prevented the employer at any time from changing for the future the wages he would pay. * * * The pendency of a negotiation for a collective contract would not destroy the employer's right in this regard." N. L. R. B. v. Whittier Mills Co., 5 Cir., 1940, 111 F.2d 474, 478. And more recently in N. L. R. B. v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed. 230, by the frequent reference to the fact that the employer "without first notifying or consulting the union, [had] announced changes in the plan" for sick leave and "without having advised or consulted with the union, the company announced a new system of automatic wage increases * * *," the Court recognizes that an employer may "unilaterally" grant increases no greater than those previously offered. In expressing this negatively,[20] the Court in note 12 [21] took notice of the Bradley Washfountain case in which the Seventh Circuit held that a wage increase which was less than the union's demand could be granted legally during negotiations.

■ That leaves, then, the few changes as to some time-work jobs in which added stations were created.[22] The Employer insists that the record shows that in all of its contract proposals, it was reserving the right to grant merit increases and that the stations were merely guides for use by supervisors in such increase system. On this approach, the Employer merely did what it had long said it would do. The Board, on the other hand, simply approached it as though the prior "offers" had to relate to specific job categories. We do not think that the present record affords an adequate basis for sustaining either contention. As to this limited phase, it is therefore necessary that the case be reversed and remanded to the Board for a new hearing.

*Rulings on Evidence*

This disposition requires that we discuss very briefly some of the procedural errors asserted by the Employer. Intertwined in this question of the creation of added time-work stations will be the

---

20. "But even after an impasse is reached he [the employer] has no license to grant wage increases greater than any he has ever offered the union at the bargaining table, for such action is necessarily inconsistent with a sincere desire to conclude an agreement with the union." 369 U.S. 736, 745, 82 S.Ct. 1107, 1113.

21. To the text (see note 20, supra) the Court's note 12 stated: "Of course, there is no resemblance between this situation and one wherein an employer, after notice and consultation, 'unilaterally' institutes a wage increase identical with one which the union has rejected as too low. See Labor Board [N. L. R. B.] v. Bradley Washfountain Co. [C.A.7] 192 F. 2d 144, 150–152; Labor Board [N. L. R. B.] v. Landis Tool Co., (C.A.3) 193 F. 2d 279."

22. The term "station" refers to stepped[1] up increases in an hourly rate. Stations 1 and 2 were in most cases automatic on the basis of time, e. g., one year, two year, etc. Stations 3 and 4, etc. were merit increases with management evaluation of skills, etc.

question of impasse.[23] That means that there is a likelihood that the evidence problem encountered on the first trial will reoccur.

■ We think that the Examiner committed a basic harmful error in the rulings made on admissibility of evidence relating to impasse. Sustaining objections urged by the General Counsel and the Union, the Examiner excluded evidence proffered by the Employer showing or tending to show that there was an actual impasse in the negotiations on matters other than those things which were the subject of the formal complaint.[24] Although the Examiner permitted the Employer to offer evidence tending to show an impasse on the company's piece-work incentive wage system,[25] seniority, and wages, it was prevented from offering testimony indicating a likely impasse on other issues or by reason of other conditions. These included the grievance machinery, arbitration clauses, vacations, holidays, and insurance, group hospital and life insurance, profit sharing plan, and the like.

■ The existence of an "impasse" may be an important fact. Developed as it is largely by judicial action in recognition of practical considerations, it is a necessary response to a state of facts in which the parties, despite the best of faith, are simply deadlocked. The law does not force the two parties finally to agree. Indeed, the statute specifically states that the "obligation [to bargain collectively] does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C.A. § 158(d) Since it does not, once the parties are in a position of deadlock, there is a considerable latitude for so-called unilateral action. It is the fact of deadlock in good faith negotiations, not the cause of it, which is significant. Parties might, for example, hang up on a management clause,[26] or a union shop,[27] or over grievance procedures and management prerogatives.[28]

■ ■ We are completely unable to fathom the theory behind the objections or the Examiner's ruling which limited evidence of impasse to those activities which were the subject of unfair labor practice charges. On neither considerations of relevance nor procedural ones of keeping the hearing within some reasonable bounds can the ruling be sustained. Indeed, as to some of the charges, particularly the so-called unilateral increase in wages, changes in classification, rates, etc., existence of an impasse would under certain circumstances be a complete justification. If there is a genuine deadlock which cannot fairly be attributed to bad faith in bargaining, the employer is not helpless. Of course, his self-help must still be circumscribed, cf. N. L. R. B. v. Katz, supra. But he need not await union consent or approval. The existence of the deadlock, not its cause, is the important thing. Of necessity, considerable

23. Cf. May Department Stores Co. v. N. L. R. B., 1945, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; N. L. R. B. v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320; Medo Photo Supply Corp. v. N. L. R. B., 1944, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007; cf. Armstrong Cork Co. v. N. L. R. B., 5 Cir., 1954, 211 F.2d 843, 847–848.

24. The amended complaint (as orally amended) charged failure to bargain in good faith for (a) changing of production quotas, (b) announcing new piece-work rates, (c) changing from piece-work to time work, (d) changing job description, (e) failure to furnish standards and classification data, (f) refusal to fur-

nish data, (g) soliciting employees to bargain directly, and (h) demanding acceptance of proposals to frustrate collective bargaining; and § 8(a) (1) threats of reprisals.

25. The Report almost accepts this. See note 15, supra.

26. N. L. R. B. v. American National Ins. Co., 1952, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027; N. L. R. B. v. Intracoastal Terminal, Inc., 5 Cir., 1961, 286 F.2d 954.

27. N. L. R. B. v. Cambria Clay Products Co., 6 Cir., 1954, 215 F.2d 48.

28. White v. N. L. R. B., 5 Cir., 1958, 255 F.2d 564, 567.

latitude must be allowed in offering evidence pro and con on this issue. It will encompass all of the issues or contentions as to which it is claimed there was a basic and irreconcilable difference. And since this examines into both subjective and objective intent, motive, good faith, etc., a similar latitude must be afforded as to events before and after the wage changes. Cf. Shreve v. United States, 9 Cir., 1939, 103 F.2d 796, cert. denied, 308 U.S. 570, 60 S.Ct. 84, 84 L.Ed. 479; Benchwick v. United States, 9 Cir., 1961, 297 F.2d 330; United States v. Prince, 3 Cir., 1959, 264 F.2d 850; Waller v. United States, 9 Cir., 1949, 177 F.2d 171. Since this evidence was repeatedly excluded and may well have tipped the balance,[29] there must be a new hearing.

As there must be a new trial concerning these March-April added stations in time-work jobs in order to determine the questions of (a) impasse, or (b) prior consultation with the Union as to them, it is also necessary to make brief comments about another procedural action which, likely as it is to recur, is vigorously asserted as a substantial error. Both as to these matters and as to those constituting the specific subject of the complaint (see note 24, supra), the Employer offered in evidence (a) detailed summaries of the bargaining sessions, (b) a court reporter's stenographic report of one of them, and (c) a tape recording of at least the last one. The Examiner over objection of the Union counsel excluded them.

The detailed summaries were prepared by the Employer's chief negotiator within a day or two after the completion of each session from notes kept in his own handwriting. As a witness then and there subject to cross examination, he swore that each was true and correct at the time it was made. He likewise swore that he had examined the court reporter's transcript and that it was an accurate statement of what had occurred. The same was true as to the tape recording.

Without undertaking at this time to blueprint the exact manner in which these materials are to be handled or received on the retrial, we are of the firm view that too rigid a position was maintained by the Examiner. These rulings were the response to an enticing, but superficial, logical dilemma urged by the Union counsel. It went like this. Since the chief negotiator as a witness affirmed that on reading them, they "revived his memory," the papers could not be used and his testimony had to come from a recollection stimulated by the paper, but not then read by him. On the other hand, his memory having been revived through the papers, they would not qualify as a record of a past recollection even though he presently swore they were true at the time prepared and signed.

Several factors persuaded us that in this situation such an approach is too inflexible and artificial. At the outset, there is no real basis for claiming this to be hearsay. The evidence being offered—an affirmation of the correctness of written statements—was given by a person then and there under oath and subject to cross examination. More important, as to most of these written statements, it is not hearsay at all. In passing upon what transpires in the process of collective bargaining negotiations, physical (non-verbal) actions as such are, of course, occasionally pertinent.[30] But primarily negotiations are established by proof of the words that were spoken by

29. Accepting the Examiner's words, it would not have taken much more. See note 15, supra.

30. This might be, for example, true as to the incident of the last meeting which, the Employer contends, is reflected by the tape recording. According to the Employer this episode includes the loud, obnoxious language and mannerisms used by Union representatives showing that the parties were hopelessly deadlocked. The climax was reached when a Union negotiator, in an outburst of temper, threw the recording microphone to the floor where it landed with a loud crash.

the protagonists. Proof of the words spoken is made, not to establish the truth of the things stated, but the fact that the words as such were spoken. Anyone overhearing such words, whether a spokesman or not, is therefore a direct witness to a fact known by him and as to which he may be cross examined. Such verbal or operative facts are in no sense hearsay.[31] And clearly, for this purpose, there could hardly be better proof of words spoken than an electronic tape recording properly identified and authenticated.[32] Even more important, in this difficult area of determining whether bargaining has gone on in good faith, both the Board and the reviewing Court should have the benefit of the most reliable proof obtainable. In the search for truth, it is not ordinarily the simple dichotomy of "either or." A paper may refresh one's recollection and at the same time the subject matter may be such that the recollection, refreshed as it is, is incapable of reciting all of the details which were recorded shortly after the event under circumstances which attest to the reliability, trustworthiness and truthfulness of the record.[33] Consistent with adequate safeguards committed largely to the considered judicial discretion of the presiding Judge or Examiner, the principle followed in the federal system is to apply the rule which favors admissibility. See F.R.Civ.P. 43(a); Dallas County v. Commercial Union Assur. Co., 5 Cir., 1961, 286 F.2d 388.

Nothing said or unsaid by us is an intimation, one way or the other, concerning what the outcome should be on these limited issues now remanded for a new hearing. That, as well as all questions concerning the nature, form or extent of any final order, see N. L. R. B. v. R. L. Zeigler, Inc., 5 Cir., 1962, 298 F.2d 671, 673, must await the outcome of the retrial.

Enforcement denied in part; order reversed and remanded in part for a new hearing.

31. Huff v. United States, 5 Cir., 1962, 301 F.2d 760; Ward v. United States, 5 Cir., 1961, 296 F.2d 898; Safeway Stores. Inc. v. Combs, 5 Cir., 1960, 273 F.2d 295.

32. Cf. N.L.R.B. v. Walton Mfg. Co., 5 Cir., 1961, 286 F.2d 16. Recordings are admissible in a criminal case, see Cape v. United States, 9 Cir., 1960, 283 F.2d 430. See also 58 A.L.R.2d 1028; Conrad, Magnetic Recordings in Courts, 40 Va.L. Rev. 23; Simpbaum, Evidence—Admissibility of Partially Inaudible Recordings, 34 N.C.L.Rev. 233.

The Employer, citing these cases, asserts that it is the Board's "policy" to exclude tape recordings. Walton Manufacturing Co., 124 NLRB No. 181, 45 LRRM 1007 (1959); California Lingerie, Inc., 129 NLRB No. 108, 47 LRRM 1091 (1960); Duro Fittings Co., 130 NLRB No. 71, 47 LRRM 1363 (1961); American Aggregate Co., Inc. and Feathertite Corp., 130 NLRB No. 144, 47 LRRM 1517 (1961).

33. The factors are discussed in McCormick, Evidence, §§ 276 to 280, Records of Past Recollection, especially §§ 277-8 and also § 9 Refreshing Recollection, especially at p. 18.