**BECKLEY MANUFACTURING CORPORATION, Plaintiff,**

v.

**LOCAL UNION 2011 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS—AFL–CIO, Defendant.**

**No. 508.**

United States District Court
S. D. West Virginia,
Beckley Division.

Jan. 28, 1969.

Peyton H. Moss, Poletti, Freidin, Prashker, Feldman & Gartner, New York City, Robert J. Ashworth, Ashworth & Ashworth, Beckley, W. Va., for plaintiff.

Stanley M. Hostler, Charleston, W. Va., for defendant.

## MEMORANDUM OPINION

FIELD, Chief Judge.

This action was instituted on February 25, 1966, by the Beckley Manufacturing Corporation (the Company) against Local 2011 of the International Brotherhood of Electrical Workers, AFL-CIO (the Union), seeking both a declaratory judgment under 28 U.S.C. § 2201 to the effect that certain matters the Union seeks to submit to arbitration are inarbitrable under the terms of the applicable collective bargaining agreement (the Agreement), and a permanent in-

junction against the arbitration of such matters. Jurisdiction in this court was invoked under Section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185.

Plaintiff also sought a preliminary injunction against the arbitration pending determination of this case. On October 4, 1966, this court, by letter ruling, granted plaintiff's motion for a preliminary injunction, and at the same time denied a motion by defendant to dismiss the complaint for failure to state a claim upon which relief could be granted. An order granting a preliminary injunction staying the arbitration pending final determination of this action was entered on October 25, 1966, and is still in effect. Trial of the action was held in Beckley, West Virginia, on September 6, 1967.

The Union is an unincorporated labor organization recognized by the Company as the bargaining agent for the Company's production and maintenance employees and is affiliated with the International Brotherhood of Electrical Workers—AFL-CIO (the IBEW). The employees of the Company who are represented by the Union are engaged in the manufacture of goods in interstate commerce. The IBEW filed the Demand for Arbitration, which is the subject of this action, on behalf of the Union.

The Company is a West Virginia corporation with its offices and principal place of business located in Beckley, West Virginia. It is engaged in the manufacture of certain electronic components. Its employees are compensated primarily on the piece rate basis: i. e., a different rate being fixed for each specific job. This particular action is concerned with Department 81 of the Company, wherein approximately four thousand rates are worked from time to time, depending upon the types of items being produced at the plant at any particular time.

When this action was commenced there was an existing collective bargaining agreement between the Company and the Union. That agreement had been executed in 1964 and was effective for the period from May 1, 1964 to April 30, 1966. It was provided in the Agreement that grievances not settled between the parties might be referred to arbitration by the American Arbitration Association. The Agreement further provided, however, in Art. VI, Sec. 4, that: " * * * No matter shall be taken up under this Article which shall in any way involve change or modification of any of the terms or provisions of this Agreement."

On or about September 27, 1965, the Union filed a grievance, entitled LU-1 wherein it complained that certain provisions of the Agreement were being violated. It specifically alleged violation of Article XII of the Agreement in that (1) the rates in the Coil Winding Department allegedly did not yield an average 25 per cent bonus which the Union contended was required by Art. XII, Sec. 2, and (2) the Company was refusing to provide the Union with information claimed to be necessary in order to process incentive rate grievances. For relief the Union asked for (1) back pay to May 1964 for all employees, based upon average departmental incentive performance rather than on individual rates and performance, and (2) the adoption of certain procedures the Company alleges were not required by the Agreement relative to the study of disputed rates.

On November 3, 1965, a meeting was held between representatives of the Company and the Union relative to the Union's complaint. At that time the Company took the position that the demands made by the Union could not be considered. Their position was that these demands were inarbitrable under the Agreement in that they attempted to grieve the rates of an entire department rather than individually as contemplated by the Agreement.

On December 29, 1965, after additional discussion and correspondence, a Demand for Arbitration was sent to the Company by the International Representative of the IBEW. It called for

arbitration under the auspices of the American Arbitration Association. This Demand was made on behalf of Local 2011, the Union herein. In the Demand for Arbitration, the IBEW asked that the assertions of the Union in the grievance it had filed with the Company hereinabove set forth be submitted to arbitration. Upon its receipt of the Demand for Arbitration, the American Arbitration Association requested both the Company and the Union to prepare to proceed with arbitration of the matters set forth in the Demand.

The Company refused to participate in the arbitration, or any preliminary steps relative thereto, and continues to so refuse. This refusal is based upon its contention that the Demand for Arbitration is invalid and that the matters purported to be submitted to arbitration thereunder are inarbitrable since they seek to arbitrate matters which involve modification of the terms and provisions of the Agreement which are non-arbitrable under Art. VI, Sec. 4.

More specifically, the Company makes the following specific allegations relative to the inarbitrability of the Union's demands:

"(a) The demand that all the rates in Department 81 yield an average 25 percent bonus to employees in the department seeks to change or modify Article VII, Sections 1 and 2, of the Agreement, in that the said sections only require that the said rates provide an opportunity for the average experienced efficient operator to earn a bonus of 20 to 30 percent of the incentive rate, the objective being an average of 25 percent or more.

"(b) The demand seeks to change or modify Article XII, Section 3, of the Agreement by grieving generally all the incentive rates in the Department 81 without regard to the earnings yielded by particular rates or the manner in which said rates were fixed, whereas the said Section 3 and the procedures thereafter provided in the subsequent relevant section of said Article XII, require that a particular

rate or rates be challenged and that a subsequent adjustment of such particular rate or rates be made, if necessary, after review thereof in accordance with the provisions of the Article.

"(c) The demand for back pay to all workers in the said Department 81 from the inception of the Agreement, *viz.* May 1, 1964, in connection with the challenge to all the established rates, seeks to change or modify Article XII, Section 3, of the Agreement in that the said Section provides that back pay shall be limited to a period of ten (10) days prior to the date of grievance protesting a rate was presented to the COMPANY, if an increase in rate would have affected the operator's earnings.

"(d) The demand that the Union be informed when restudies of grieved rates are to be made seeks to change or modify the Agreement since neither Article XII, Sections 3 or 7, thereof nor any other provision therein contains any such provision.

"(e) The demand that the Union be allowed to have 'a representative present during such restudies' of grieved rates seeks to change or modify the Agreement, inasmuch as Article XII, Section 7, thereof specifies 'an authorized Union time study man' as the only person the COMPANY need permit to check disputed jobs with the COMPANY time study department including a check study or time study of the job in dispute on the plant floor.

"(f) The demand that when such restudies of grieved rates are made 'the time study man' provide the Union representative with certain specified information before leaving the job site seeks to change or modify the Agreement since neither Article XII, Sections 3 or 7, thereof, nor any other provisions therein contains any such Agreement."

In addition, the Company alleges that the demand that all time study data to be retained at the Beckley plant is not

now arbitrable since it has been settled by the grievance procedure of the Agreement. The Company submits that the Union acknowledged this in a letter to the Company, dated December 29, 1965, accompanying the Demand for Arbitration, reading in part as follows: "The Company now has the production standards, time studies and their supporting data at this plant, rather than at its New Jersey plant, and is complying with our Agreement in this respect."

The Company, in advocating its position here, also stresses the point that the Union is seeking to arbitrate all of the rates of an entire department. In addition, the Union is also admittedly interested in filing other grievances and arbitration demands (already enumerated LU–2 through LU–6) which would grieve the remainder of the rates in the Company's plant. The Company's position is that the Agreement provides only for the grieving and arbitration of individual rates.

To support its position the Company cites Art. XII, Section 3 of the Agreement, entitled "Rates Subject to Grievance Procedure," which provides as follows:

"At any time after *the* rate has been worked for ten (10) days, the Union may question incentive rates, and, if same are not adjusted by agreement of the parties, *it* shall be settled by the grievance procedure of this Agreement. The Union shall have the right to question the time study of *any job* that may appear to be improperly timed, and to request the retiming of *any job* through the grievance procedure. Upon receipt of a request for retiming, the Company shall, within forty eight (48) hours from the receipt of such request (unless prevented by special circumstances) retime *the protested job.* Any increase in *the rate* shall be retroactive to a date ten (10) days prior to the date the grievance was presented to the Company, if the increase would have affected the operator's earnings. However, in the event that such retroactivity is

impracticable, then the Company and Union may mutually agree on a settlement." (Emphasis added.)

In addition, the Company's General Manager testified that throughout the entire period since the first agreement between the Company and the Union in 1958, only *individual* rates had been grieved. Prior to LU–1 and its companion complaints, the Company had never received a grievance directed to the entire rate structure of the Company or one or more of its departments.

On the other hand, the Union relies on what it refers to as "a broad, all-inclusive arbitration clause," specifically Art. III, Sec. 4 of the Agreement, which provides as follows:

"Section 4. The Union and its members agree that during the term of this Agreement, they will not cause or take part in any strike, slowdown, stoppage, or interference or interruption of production in the Company's plant, or picketing; and the Company agrees that there shall be no lockouts. *The arbitration machinery established in this Agreement shall be the sole and exclusive remedy of the parties in the event of any violation or threatened violation of the Agreement.*" (Emphasis added.)

The Union submits that under this clause and the law applicable to arbitration, the grievances here in controversy are arbitrable matters.

Section 201 of the Labor-Management Relations Act of 1947, 61 Stat. 152, 29 U.S.C.A. § 171, provides, in part, as follows:

"That it is the policy of the United States that—

\* \* \* \* \* \*

"(b) the settlement of issues between employers and employees through collective bargaining may be advanced by \* \* \* voluntary arbitration \* \* \* or by such methods as may be provided for in any applicable agreement for the settlement of disputes; \* \* \*."

In addition, Section 203(d) of that Act, 61 Stat. 153, 29 U.S.C.A. § 173, provides, in part, as follows:

"Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. * * *"

The Union submits that substantial weight should be given to this announced public policy favoring arbitration. Furthermore, it says that the contract, by virtue of Art. III, Section 4, provides that the grievances and demand of concern here are arbitrable issues.

In support of its position the Union cites several cases, including the landmark decision in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), wherein the federal policy favoring arbitration was stated:

"Other courts—the overwhelming number of them—hold that § 301(a) is more than jurisdictional—that it authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements.

*    *    *    *    *    *

"Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike. Viewed in this light, the legislation does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way."

The basic federal law relative to arbitration was fashioned by the Supreme Court in the triology of the Steelworkers cases in 1960. In United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S.

574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), in discussing whether an employer should arbitrate an issue on which the contract was silent, the Court stated:

"A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement.

" * * * Here arbitration is the substitute for industrial strife.

*      *      *      *      *      *

" * * * An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

The other Steelworkers cases, United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) and United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), along with the more recent decisions in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962); Drake Bakeries, Inc. v. Local 50, American Bakery and Confectionery Workers International, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); and Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); have been cited by the Union to emphasize its position that the national labor policy of both Congress and the judiciary favors the full play of the arbitration process.

The Company does not challenge the position of the Union relative to the general national labor policy favoring arbitration of such disputes. It does, however, point out that these cases place definite restrictions upon the arbitration process. As the Supreme Court stated in United Steelworkers v. Warrior & Gulf Navigation Co., *supra*, 363 U.S. at 582, 80 S.Ct. at 1353: " * * * [A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."

In addition, Drake Bakeries, Inc. v. Local 50, American Bakery and Confectionery Workers International states, 370 U.S. at 256, 82 S.Ct. 1346, 1348: " ' * * * [A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " This case also points out that the Court in Textile Workers Union v. Lincoln Mills and United Steelworkers of America v. American Mfg. Co. did not hold that the combination of a no-strike clause and an arbitration clause requires arbitration in all cases. Specifically, at 261, 82 S.Ct. at 1351, the Court states: " * * * [T]his Court has prescribed no such inflexible rule rigidly linking no-strike and arbitration clauses of every collective bargaining contract in every situation."

The Company's position in this matter is, in summary, that the Agreement here specifically precludes the arbitration of the grievances upon which the Demand for Arbitration was based, and that since it did not agree to submit such a dispute to arbitration, under the applicable law it should not be required to do so.

The question for the court is whether the matters contained in the Demand for Arbitration are arbitrable within the contractual terms of the Agreement between the parties. An analysis of the basic Union demands must be made to determine whether or not they are arbitrable within the terms of the Agreement. There are three demands subject to such analysis:

(1) The Union charges the Company with violating the Agreement because production standards in Department 81 "do not yield the average 25 per cent bonus required, under Article XII, Section 2."

■ The Agreement itself does not require that the incentive rates yield an average 25 per cent bonus to all employees, but only that they be set to enable the average experienced and efficient operator to earn from 20 to 30 per cent above the incentive base rate, the objective being to yield average incentive earnings of 25 per cent or more. This provision of the Agreement is itself sufficient to rebut the Union charges. The Agreement does not *require* an average 25 per cent bonus as the Union alleges. For this court, or an arbitrator, to hold that such an average bonus is required would constitute a modification of the specific terms of the collective bargaining agreement.

(2) The remedy sought in the Demand is back pay for all workers in the Department from the inception of the Agreement (May 1964) to the date the issue is resolved, plus 6% interest, in an amount equal to the difference between the Department's average performance and the 125 per cent incentive expectancy allegedly established by the Agreement.

■ The Agreement itself limits back pay to any increase in a particular rate retroactive to a date 10 days prior to the date the grievance as to that rate was presented to the Company, if that particular rate increase would have affected a particular operator's earnings. In the light of this limitation, it is clear that the remedy sought by the Union would again effect a change in the explicit provisions of the Agreement relative to back pay allowable.

(3) The Union also complains that the Company has failed to provide it with necessary information to process incentive rate grievances and demands that all time study data be retained at the Beckley plant, with the Union allowed free access thereto. It also demands that the Union be notified when restudies of grieved rates are to be made and be allowed to have a representative present during such restudies. In addition, the Union demands that before the time study man leaves the job site he should provide the Union's representative with certain information relative to the study.

■ The Agreement only requires the Company to preserve its time studies, restudies and other pertinent data, to make it available for review by the Union

Chief Steward, or some other competent authorized Union representative. It permits an authorized Union time study man to check disputed jobs with the Company's time study department, including a check study or time study of the job in dispute on the plant floor. It contains no requirement for notification to the Union when restudies of rates are to be made, for permitting a Union representative to be present or for furnishing the Union, before the time study man leaves the job site, with any information.

A comparison of the relief sought by the Union with relevant provisions of the Agreement discloses discrepancies between the terms and provisions of the Agreement and the changes the Union hopes to obtain through arbitration. Additionally, the Union's demand for arbitration of its request that data be kept at the Beckley plant would now appear to be moot since as heretofore stated the Union conceded in its letter of demand that the Company was in compliance with the Agreement in this respect.

A conclusion to the effect that the Union is attempting to submit to arbitration matters "which involve change or modification" of terms of the Agreement is confirmed by the specific provisions of Article XII, Section 3, entitled "Rates Subject to Grievance Procedure." A reading of this section, which is set forth above, establishes beyond doubt that the Agreement contemplates grievances as to individual rates only.

The Agreement provides that any time after "the rate" has been worked for ten days the rates may be questioned and if not adjusted by agreement "it" shall be settled "by the grievance procedure." It then provides that the Union may question the time study of "any job" and request the retiming of "any job" through "the grievance procedure." Upon a request for retiming, the Company is obliged by the Agreement to retime "the protested job." Any increase in "the rate" shall be retroactive to a date ten days prior to the date the grievance was presented. These provisions, phrased in the singular, clearly demonstrate that the parties agreed only to provide for the grieving of individual rates and fashioned the Agreement to accomplish this object. Furthermore, the evidence reflects that the unvaried practice under the Agreement, and the agreements which preceded it, was to challenge and grieve individual rates only. Such practice is strong evidence of the intentions of the parties and their understanding of the meaning of the contractual provisions here in question.

For the Union to now mount an attack on all of the incentive rates on a "departmental average" basis with a demand for "average back pay" retroactive for at least a year and a half rather than the ten day period specifically provided by the Agreement would rewrite the entire collective bargaining agreement between the parties on this vital aspect of their contractual relationship and would constitute a clear violation of Article VI, Section 3 of the Agreement.

It is therefore the conclusion of this court that the Demand for Arbitration, and the relief sought thereunder, seeks to change and rewrite the express terms of the Agreement. Such change or modification through arbitration is precluded by the Agreement itself, and finds no support in the substantive labor law which has been developed by judicial decisions in this area.

The matters sought to be submitted to arbitration by the defendant are inarbitrable under the Agreement, and the injunction against the arbitration of these matters should be made permanent.

Counsel may submit an appropriate order incorporating this opinion by reference as my findings and conclusions under Rule 52 F.R.Civ.P.