ASSOCIATION OF CHEMICAL EMPLOYEES, Plaintiff,

v.

E.I. DU PONT de NEMOURS & CO., INC., Defendant.

Civ. A. No. 2:88–1494.

United States District Court,
S.D. West Virginia,
Charleston Division.

Dec. 21, 1988.

William D. Turner, Grant Crandall, Crandall & Pyles, Charleston, W.Va., for plaintiff.

Charles L. Woody, Hastings S. Trigg, Jr., Spilman, Thomas, Battle & Klostermeyer, Charleston, W.Va., Hastings S. Trigg, Jr., Sr. Counsel, E.I. DuPont de Nemours & Co., Inc., Wilmington, Del., for defendant.

DENNIS R. KNAPP, District Judge.

Plaintiff, Association of Chemical Employees (ACE), filed this action in District Court for the sole purpose of obtaining injunctive relief to prevent defendant, E.I. du Pont de Nemours & Co., Inc. (DuPont), from implementing its involuntary random drug testing program and to compel arbitration of the issue pursuant to the terms of the Collective Bargaining Agreement (Agreement).

The matter came on for hearing on the 8th day of December, 1988, on plaintiff's application for a preliminary injunction.

In accordance with the Court's order heretofore entered on December 9, 1988, which denied plaintiff's motion for preliminary injunction, the Court makes the following Findings of Facts and Conclusions of Law.

## FINDINGS OF FACT

1.  ACE is an unincorporated and non-affiliated labor organization with its principal office in Belle, Kanawha County, West Virginia, within the jurisdiction of this Court. ACE is the exclusive bargaining representative for employees of the laboratory at DuPont's Belle Plant.

2.  DuPont is a corporation organized and existing in the State of Delaware authorized to do business in the State of West Virginia. DuPont operates its Belle Plant in Kanawha County, West Virginia, within the jurisdiction of this Court.

3.  On or about November 1, 1965 ACE and DuPont entered into a Collective Bargaining Agreement (Agreement), whereby DuPont recognized ACE as the exclusive bargaining agent for its laboratory employees for the purpose of collective bargaining with respect to rates of pay, wages, hours of work, and other conditions of employment. The Agreement continues in full force and effect from year to year unless one of the parties were to give 60 days' notice prior to any expiration date of its desire to terminate the Agreement. Neither party noticed the other to terminate the Agreement 60 days prior to November, 1988, and the Agreement remains in effect.

4.  The Belle Plant proper is one-quarter mile wide and one mile long, stretching along the Kanawha River eight miles east of Charleston, West Virginia. It is situated in the Kanawha River Valley, with steep mountains on one side, the river on the other, and heavily populated residential areas at either end and across the river. Approximately 15,000 people live within a two-mile radius of the plant. Within one-fourth mile of the plant is an elementary school and a nursing home. A busy four-lane highway cuts through the plant property.

5. The Belle Plant is a highly complex, multiprocess facility, which routinely handles hazardous chemicals in very large volumes. One hundred fifty of the chemicals are, in fact, considered highly hazardous by the EPA and OSHA. After the Bhopal Disaster sixteen chemicals were identified corporate-wide as clearly the most hazardous that the Company uses. The Belle Plant handles eleven of the sixteen. They are: Amines, Ammonia, Hydrogen Cyanide, Phosgene, Butyl Isocyanate, Bromine, Chlorine, Sulfur Dioxide, Sulfur Trioxide, Annhydrous Hydrochloric Acid and Prhosphorous Oxychloride. There are five plant operating areas: Amines, Formaldehyde, SLM/Ag Mature, Methacrylates, and SSS. One or more of the above chemicals is used in each area. In addition the waste treatment plant uses chlorine and is the last line of defense on releases to the river. B–Plant (utilities) compresses ammonia and provides compressed gas for plant process control. The powerhouse provides a steady stream supply which is essential in preventing process upsets. The mechanics in the operating areas and central shop work on, in and around equipment from all these areas.

6. It has been over fifty (50) years since a Belle Plant lab employee suffered an on-the-job injury or accident resulting in a single lost work day. One year ago DuPont's Board of Directors presented a special award to the Belle Plant lab in recognition of this accomplishment. To date no laboratory analyst has been required to take a "for cause" drug test.

7. In the Spring of 1988 representatives of DuPont originally related to its employees their intention to implement a mandatory drug testing program at the Belle Plant.

8. ACE and DuPont engaged in the above-described discussions concerning the random drug testing program on August 23, 29, September 2, 9, 12, 13, 15, 20, 23, 30, October 4, 10, 12, 18, and November 1, 1988.

9. DuPont has enacted Belle Plant General Conduct Rules. An earlier version of Rule No. 7 stated: "The use, or possession of intoxicants or illicit drugs on the premises, or reporting for work under the influence of intoxicants or illicit drugs" is prohibited. In June, 1988 DuPont announced that it intended to modify Rule No. 7 to read: "The use, possession, distribution, sale or presence in the body of alcohol or controlled substances for non-medical reasons" is prohibited. The question of whether du Pont's modification of Rule No. 7 as it relates to for-cause testing was properly bargained with the union is the subject of a complaint issued by the General Counsel of the National Labor Relations Board in Case No. 9–CA–25580.

10. Hereinafter is a summary of the proposals enunciated by the parties, which proposals are described in greater detail in DuPont's "Belle Plant Mandatory Drug Testing Program" and the "Proposed Drug Testing Agreement by the Association of Chemical Employees" and in the parties' above-described discussions. One element of the DuPont's proposal is a mandatory random drug testing procedure. In the selection process, employees will be identified by social security number. All employees in critical assignments will be tested over nominally the first two years of the program. Any employee in a critical assignment could be randomly tested at any time. DuPont plans to utilize a two-drum system. There will be a two-year drum where social security numbers are selected and not replaced. This is to ensure that all employees will be tested at least once in the first two years. There will also be a random drum where social security numbers are selected and replaced. This drum allows an employee to be selected at any time. Medical personnel will draw the numbers on different days of the week. The drums are locked in a special locked room in the medical area, and random drum social security numbers are completely replaced periodically.

11. Regarding the sampling sequence under DuPont's proposal, the medical department notifies the immediate supervisor that a selected individual, under his supervision, should report to give a sample as scheduled. Employees report to a designated area and show their identity by their

plant passes. An employee gives the sample in a "dry room," i.e., a private room with no water supply except for the toilet, which will contain a bluing agent. No observer will be present in the room when the employee gives the initial sample. After initial sampling and a check of the temperature and appearance of the urine specimen by a medical representative, if the medical representative reasonably suspects that the employee has tampered with the specimen, observation will be required. The observer will be of the same gender as the employee. In the employee's presence, the sample is split and placed in two specimen bottles for shipment to two separate, independent laboratories. The employee witnesses the sealing of the samples and initials the labels. In addition to a DuPont release form filled out and signed in part before giving the samples and in part after giving the samples. The employee signs chain of custody documents that will accompany the samples to the independent testing laboratories. The specimen bottles and shipping containers are tamper-proof. The specimens are then locked in a nurse's cabinet. The specimens are transported by courier to the Roche Laboratory and Princeton Diagnostic Laboratories of America (PDLA). The results from Roche are electronically transmitted to the Roche Local Office in South Charleston. The Roche courier then returns the results to the medical department to be checked by DuPont's registered nurse or plant doctor. Negative results are telephoned to the employee and an employee relations representative by the nurse. In case of positive results received from Roche, the plant doctor notifies PDLA and requests that its corresponding specimen be analyzed by gas chromatography/mass spectrometry (GC/MS) for the drug(s) reported by Roche. A Sample from an employee is regarded as negative unless it has been declared positive by both Roche and PDLA by the GC/MS methodology. Both Roche and PDLA store the remainder of the sample determined to be positive for at least one year for possible reanalysis.

12. ACE submitted a proposal during the above-described discussions which is distinguished from mandatory random testing and is characterized as a "for cause" test. "For cause" under the Union proposal means specific, objective facts and circumstances indicating that a particular individual is impaired by an illegal drug while on the job. Under the ACE proposal, a determination that cause exists for testing must be made in writing by two supervisors, preferably the employee's immediate supervisor or a qualified physician from the medical department. While not a part of its written proposal, ACE asked (in the event of random testing) that representatives of the Union be present when numbers are drawn from the drums on a spot basis; DuPont opposed this suggestion except on the first drawing so that ACE could observe the procedures initially.

Under the ACE proposal, the samples shall not be analyzed or tested in any manner if a dispute arises. ACE proposes that an employee should furnish a urine sample at the time it is requested; however, the sample shall be stored in a freezer at a mutually agreed upon location on site. Access to the samples shall require two keys with separate locks, one key in the possession of DuPont and one key in the possession of ACE.

Samples shall be taken within a private stall or other dry, partitioned area. DuPont shall station an observer outside the stall or partitioned area. Upon receipt of the sample, the company observer shall measure the sample in order to ensure it contains a sufficient amount of urine and take the temperature of the sample within four minutes of urination. If the observer has cause to believe that the sample has been adulterated, the employee may be required to furnish a second sample as soon as possible. Thereafter, the specimen is closed with a tamper-proof seal and labeled with a number identifying the donor. Strict chain of custody procedures shall be adhered to with each sample.

ACE contested the confirmation process at the second laboratory selected by du Pont, PDLA. ACE's position was that DuPont's program was improperly suggestive since DuPont would indicate to the laboratory the drug allegedly involved, rather

than using a blind process. DuPont's program for analyzing the second sample establishes cut-off points for each drug metabolite that is as low as is technically feasible, and DuPont has indicated that it would reduce the cut-off point whenever technological changes would permit. ACE expressed concern that such cut-off levels may lead to inaccurate results and are lower than governmentally established cut-off levels, which are applicable to the federal government.

Additionally, ACE proposes a split-sample option whereby the employee may request that one sample be forwarded to a laboratory of his or her choice for testing at his or her expense. The ACE proposal requests DuPont to take reasonable steps to minimize the number of individuals with access to the test results data and to maintain security regarding such data. It specifically requires that the prescriptions medications list provided by the employee be sealed and not opened unless needed in reference to a possibly positive test result. ACE proposed with regard to confidentiality that the appropriate code in this regard would be the American Occupational Medical Associations' Code of Ethical Conduct for Physicians Providing Occupational Medical Services and its Drug Screening in the Work Place Ethical Guidelines. ACE also suggested that any breach of confidentiality be treated a serious misconduct.

ACE contested the method by which test results would be communicated to employees in view of confidentiality considerations. Under DuPont's plan only those persons testing positive would be notified by the medical office for an interview by the plant doctor. Those testing negative would simply be contacted by telephone. ACE pointed out that it would become evident to anyone at the Belle facility whose test results were positive since they would be the ones called to the medical office. ACE's program stated that it would "emphasize education and rehabilitation first, and punishment only after rehabilitation fails." It was ACE's position that this contrasted with DuPont's program in which it was suggested that rehabilitation is not a substitute for corrective action including discharge, and termination under DuPont's program would be decided upon by management.

ACE's position questioned the DuPont plan concerning how an individual might be identified for the drug abuse program. Included among the methods stated in DuPont's program was "be[ing] referred." ACE took the position that there was a substantial possibility under such circumstances that individual vendettas or other improper considerations could lead one person at DuPont to refer an individual upon something other than an appearance of impairment on the job. DuPont has stated it would not act solely upon an anonymous referral.

ACE also took the position that there was no mechanism in the DuPont program for a fair and bilateral way to make sure of the objective nature of such circumstances. ACE sought a guarantee that a member of the bargaining unit in question would have a right to a union representative in any meeting that could subject the member to possible discipline. During discussions between representatives of DuPont and ACE concerning the random testing plan, DuPont took the position that it has the discretion to respond to a test result which turns up positive as if it were negative if the surrounding circumstances would medically justify such a conclusion. ACE disputed this claim and opposed this discretion on the part of management.

13. DuPont's lab employees have taken great pride in the accuracy of the work of their laboratory, and have on a number of occasions engaged in "round robins" for accuracy with other laboratories in the DuPont system and have consistently obtained accurate results in comparison with other labs.

14. On September 23, 1988, the parties engaged in the above-described discussions about DuPont's mandatory drug testing proposal. Changes were made in DuPont's original plan. These changes included that any information dealing with an individual case, including drug test results, would not be revealed to outside authorities without a

valid subpoena, the employee's written consent, or as otherwise required by law. Additionally, for rehabilitation purposes, the plant doctor could consult with the individual employee's personal physician if the plant doctor deemed it appropriate. Likewise, the plant doctor could seek such input prior to the employee's return to work. From its outset the DuPont proposal included some features aimed at limiting access to sensitive information, such as drug test results and rehabilitation, to those within the Company with a need to know, such as the employee's line supervisor, plant staff, the plant physician, other medical personnel, and appropriate human resources personnel. DuPont did not agree with ACE's proposal for a sealed list of prescribed medications that would not be accessible to the plant physician unless the test was positive.

15. After 15 meetings on the subject of mandatory drug testing, DuPont declared that further meetings on the topic would be futile and announced on November 1, 1988, an impasse.

16. Article II, Section 3, of the Agreement between DuPont and ACE provides:

This Agreement constitutes the entire agreement between the parties hereto as of the execution date hereof. However, any supplements which may hereafter be mutually agreed upon between the parties when executed in the same manner as this Agreement shall become and be a part of this Agreement.

17. Under Article VIII, Section 3, of the Agreement a "grievance" is defined to be "any matter of dissatisfaction on the part of one or more employees in reference to his or their employment."

18. Under Article XII, Section 1, of the Agreement, the arbitration clause reads:

In the event that differences shall arise between the COMPANY and the ASSOCIATION as to the meaning of any provision of this Agreement, and such differences are not otherwise settled, such differences, at the request of either party, shall be submitted to arbitration.

19. Since 1965 no matter has ever been submitted to arbitration under the Agreement.

20. On November 7, 1988 ACE submitted a grievance to DuPont as follows:

Under Article VIII, Section 3 of the Agreement, the Association of Chemical Employees ("ACE") is aggrieved by du Pont's mandatory random drug testing program (dated November 1, 1988 to take effect November 15, 1888). In keeping with ACE's September 23, 1988 bargaining proposal, ACE opposes random drug testing on the grounds that (1) it is an unreasonable invasion of privacy; (2) it violates the presumption of innocence; and (3) there is no evidence of drug abuse by lab employees. ACE supports a reasonable drug testing program on a for cause basis, such as our September 23, 1988 proposal, and requests rescission of du Pont's random drug testing plan, and such further relief as may be appropriate under the circumstances.

In view of the company's plan to implement random drug testing on November 15, 1988, ACE requests that all step meetings be completed by the close of business on Friday, November 11, 1988.

21. On November 11, 1988, the parties engaged in discussions over ACE's grievance, and the grievance was denied. The third step meeting occurred on November 14, 1988, and the grievance was again denied. Further, DuPont informed ACE that it would not agree to arbitration.

22. In addition to the mandatory random drug testing program, DuPont has instituted a "for cause" program. On July 22, 1988, ACE filed an Unfair Labor Practice Charge against DuPont as follows:

On June 17, 1988, the above-named Employer implemented a mandatory for cause drug testing program for all laboratory employees, without engaging in collective bargaining with the Association of Chemical Employees, in violation of Section 8(a)(5) of the Act. The Employer's program was implemented after only four meetings with the Association (June 2, June 10, and two on June 17, 1988), none of which involved legitimate

collective bargaining. At each of these meetings, the Association of Chemical Employees stated that it wishes to engage in collective bargaining concerning the implementation, procedures, and effects of such a program.

23. A complaint was issued on the charge; however, no hearing has been held on the charge, nor did the Union file a grievance over this matter.

24. DuPont management has no specific evidence of a drug use or abuse problem among employees in the ACE bargaining unit. Instead, DuPont relies on its perceptions, based on statistical evidence of increased drug use in society in general, in support of its desire to impose random drug testing on ACE unit employees.

## CONCLUSIONS OF LAW

1. This matter was filed pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331.

2. The issue of arbitrability of an issue is a matter for judicial determination. *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

3. The grievance and arbitration clauses of the Agreement herein are separate and distinct. The arbitration clause, Art. XII, Section 1, is limited to resolving disputes only relating to "the meaning of any provision" of the Agreement.

4. The parties engaged in collective bargaining from August to November, 1988, on a non-contractual mandatory random drug testing topic. There is no provision in the present Agreement to submit such a dispute over a non-contractual matter to arbitration. *Lodge 802 v. Pennsylvania Shipbuilding Co.*, 835 F.2d 1045 (3rd Cir. 1987). Since the right to arbitration is created by the terms of the collective bargaining agreement itself, the parties to the Agreement cannot be required to submit any dispute to arbitration which they have not contracted to so submit. *Steelworkers*

*v. Warrier & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960).

5. The function of the arbitrator is to resolve disputes involving the interpretation or application of terms and conditions of employment that the parties have themselves agreed to in their contract. The drug testing proposals issued by DuPont and ACE are not a part of the Agreement.

6. A grievance which seeks to arbitrate matters which involve modification of terms and provisions of the Agreement is non-arbitrable. *Beckley Mfg. Corp. v. Local Union 2011 of IBEW*, 297 F.Supp. 117 (S.D.W.Va.1969).

7. The Court has concluded, as heretofore recorded (1) that the proposed plan for company-wide random drug testing, with the safeguards to individual rights provided by the plan, is constitutionally permissible; (2) that such plan, considering its purpose and equal applicability, is not discriminatory; (3) that said plan does not, as proposed to be applied, impermissibly violate the right to privacy or any of the rights secured to persons under the 14th Amendment to the United States Constitution; and (4) said plan does not present an arbitrable issue under the terms of the Agreement between the Company and plaintiff.

8. The proposed plan does not infringe any rights guaranteed to the parties under the terms of the Agreement, nor does it violate any of the contractual obligations set out therein. Such an agreement has its genesis in fixing the obligations of the parties as to wages, benefits, and conditions relating to the activities of the parties at the workplace.

9. Additionally, no rational basis to prohibit random drug testing of all employees of the chemical manufacturing complex at the Belle Works of DuPont is created by the proposed company-wide plan of DuPont.

10. Given the safeguards of the individual employees as to confidentiality and privacy afforded by the plan, there is in the

Court's opinion no invasion of the constitutional rights of the individuals who are at the time of testing in the workplace and on the premises of the chemical complex.

11. Furthermore, it is the function of management to establish and maintain the workplace in a safe and secure manner for those who work there, and in the furtherance thereof to employ the latest technology and scientific standards to promote and preserve the same. Here that duty extends to the residents of the valley adjacent to the plant, including a school and nursing home.

12. For a preliminary injunction to be issued, four factors must first be considered by the Court: (1) Has the petitioner made a strong showing that it is likely to prevail upon the merits? (2) Has the petitioner shown that without such relief it will suffer irreparable injury? (3) Would the issuance of the injunction substantially harm other interested parties? (4) Wherein lies the public interest? See, *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977).

13. The Court finds that there is not a probability of success on the merits for ACE in that the proposals at collective bargaining are not subject to arbitration.

14. The Court finds that ACE has not proved there has been irreparable harm to its members. The testimony by ACE members concerned the publicity accorded the filing of ACE's motion to enjoin random drug testing and the members' opposition to DuPont's random drug testing program. Such testimony does not support a finding of irreparable harm on any grounds of diminished reputation.

15. Balancing the harm to interested parties and the public, the Court finds that it is in the public interest that mandatory random drug testing be implemented at the Belle Plant facility given the hazardous materials on site. Further, the Court credits the testimony of Dr. Richard Knowles, who testified that DuPont had determined that there was a substance abuse problem at the plant site.