**UNITED STEELWORKERS OF AMERICA, AFL–CIO et al., Plaintiffs–Appellants,**

v.

**ASARCO, INC., Defendant–Appellee.**

**No. 91–8483.**

United States Court of Appeals, Fifth Circuit.

Sept. 8, 1992.

Rehearing and Rehearing En Banc Denied Oct. 8, 1992.

Bruce Fickman, Houston, Tex., David Ira Goldman, Asst. Gen. Cnsl., Pittsburgh, Pa., for plaintiffs-appellants, United Steelworkers of America, AFL–CIO–CLC.

Charles C. High, Jr., Clara B. Burns, Kemp, Smith, Duncan & Hammond, El Paso, Tex., for defendant-appellee.

Before JOHNSON, GARWOOD, and WIENER, Circuit Judges.

JOHNSON, Circuit Judge:

The United Steelworkers of America appeal from an order of the district court refusing to compel ASARCO, Inc. to submit to arbitration. Persuaded that the disputes between the union and the company are arbitrable, this Court will reverse the judgment of the district court and render judgment for the union.

## I. Facts and Procedural History

ASARCO, Inc. ("the company") operates a number of smelting, mining, refining, and related facilities in Texas and Arizona. Local units of the United Steelworkers of America (collectively, "the union") represent workers at five of these plants.[1] The company and the union have entered into collective bargaining agreements covering each of these five plants. The collective bargaining agreements were entered into on July 1, 1989 and expire on June 30, 1992.

During the negotiations that produced the current collective bargaining agreements, the company proposed to implement a drug and alcohol testing policy for its workers. Although the company and the union were ultimately able to agree to a collective bargaining agreement, they were unable to agree on a testing policy, even after substantial negotiation over the issue, including revised proposals from the company and counter-proposals from the union. As a result, the collective bargaining agree-

---

1. Different locals of the United Steelworkers represent workers at each of the five plants: local 509 in El Paso, Texas; local 886 in Hay-  den, Arizona; local 5613 in Amarillo, Texas; local 6705 in Sahuarita, Arizona; and local 13886 in Silver Bell, Arizona.

ment included the following statement regarding drug and alcohol testing:

> As the parties have reached an Impasse on this subject, the Company hereby withdraws its proposal with the understanding that this Impasse and withdrawal condition will leave the respective parties with all of their legal rights and obligations on this subject.

Three months after the collective bargaining agreements went into effect, the company unilaterally imposed a mandatory drug and alcohol testing policy. The terms of the company policy make clear that the company adopted the policy "to insure that employee alcohol and drug use does not jeopardize the safety and health of its employees":

> ASARCO's employees work closely together and rely upon one another to a great extent. The safe performance of the work that our employees undertake demands each employee's full attention and clear thinking. As a result, the Company as well as each employee, has a right to expect that all employees are drug and alcohol free and prepared to do their jobs in as safe a manner as possible at all times.

The company policy provides that an employee who refuses to take the test is subject to immediate dismissal. Furthermore, an employee who fails the test is subject to discipline, including dismissal. Finally, if an employee has been laid off or otherwise absent from the workplace for six months or more, he or she must pass a drug and alcohol test before returning to work.

Union members filed grievances at each of the five plants in Arizona and Texas asserting that the testing policy violates various provisions of the collective bargaining agreements. The company refused to address the grievances and refused to submit them to arbitration. The union then brought this action, initially seeking an injunction against implementation of the testing policy. The union later amended its complaint, however, to seek instead an order compelling the company to submit the workers' grievances to arbitration. Both parties moved for summary judgment. Af-

ter a hearing, the district court found that there were no disputes as to any material facts. The court ruled that because the testing policy was not part of the collective bargaining agreement, the company had not agreed to submit disputes arising out of the testing policy to the arbitration process established in the collective bargaining agreement. Accordingly, the district court denied the union's motion for summary judgment, and granted the company's motion. The union appeals.

## II. Discussion

There is only one issue for this Court to decide in this case: are the disputes occasioned by the testing policy arbitrable? If they are, then this Court's role is limited to ordering the parties to submit to arbitration; this Court may not address the merits of the dispute.

### A. *The Presumption in Favor of Arbitrability*

The law regarding arbitrability is well settled. When a federal court is asked to compel arbitration of a labor dispute under § 301 of the Labor Management Relations Act, the only question before the court is whether there is an arbitration clause in the collective bargaining agreement which covers the dispute. The federal court is *not* to pass on the merits of the dispute; it is to decide *only* whether the arbitration clause in the agreement is "susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). "Doubts should be resolved in favor of coverage." *Id.*

The Supreme Court has recently reaffirmed the limited nature of federal judicial involvement in questions of arbitrability. A federal court asked to determine whether a dispute is to be submitted to arbitration

> is not to rule on the potential merits of the underlying cause. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the

collective bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."

*AT & T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 649–50, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960)).

The Fifth Circuit has put it this way: The courts' role is very limited when deciding issues of arbitrability. The courts' function is to decide whether the claim asserted is the type of claim which the parties have agreed to arbitrate. In no way are the courts to consider the merits of a party's claim.

*Oil, Chemical & Atomic Workers' Int'l Union, Local 4–447 v. Chevron Chem. Co.*, 815 F.2d 338, 343 (5th Cir.1987) ("*OCAW, Local 4–447*").

The company points out that the union must not be allowed to create an arbitrable issue where none exists simply by "couching" its grievances in terms of the collective bargaining agreement. The company is certainly correct. The authority of the arbitrator is grounded in the agreement of the parties; if the parties have not agreed to arbitrate an issue, then there is no basis on which to compel them to submit to arbitration. *E.g., Warrior & Gulf Nav. Co.*,

363 U.S. at 582, 80 S.Ct. at 1352; *OCAW, Local 4–447*, 815 F.2d at 340. However, in deciding what the parties have agreed to arbitrate, the court must, as noted above, resolve doubts in favor of arbitration, *AT & T Technologies*, 475 U.S. at 649–50, 106 S.Ct. at 1419, and must make its determination on the face of the collective bargaining agreement: the court "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *American Mfg. Co.*, 363 U.S. at 567–68, 80 S.Ct. at 1346.

B. *The Arbitrability of the Union's Grievances* [2]

■  The arbitration clauses in the collective bargaining agreements at issue here are quite broad. Although the precise language differs, each of the collective bargaining agreements between the company and the local unions provides that disputes relating to the application or interpretation of the agreement, or compliance with or violations of it, shall be submitted to arbitration.[3]

The claims made by the union plainly fall within these broad provisions. For one thing, each of the collective bargaining agreements involved in this action provide that "[t]he Company shall make *reasonable* provisions for the safety and health of its employees during the hours of their employment," (emphasis added), and the union asserts that the testing policy adopted by the company is *unreasonable.* Given that the company itself has characterized the policy as a health and safety regulation, an allegation that the policy is unreasonable is properly read as alleging that the policy violates the collective bar-

**2.** As in any case in which the district court grants summary judgment, this Court reviews the judgment in this case de novo, applying the same standards that apply in the district court. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 975 (5th Cir.1991).

**3.** The various collective bargaining agreements covering each of the five plants involved in this case employ the following language in their arbitration provisions. The agreements in effect with Locals 509 and 886 provide for arbitra-

tion of grievances or complaints "relating to the application or interpretation of the Agreement." The agreement covering Local 5613 provides for arbitration of grievances alleging "violation of or non-compliance with the specific provisions of this Agreement." Finally, the agreements in effect at Locals 6705 and 13886 call for arbitration of "any dispute arising as to the meaning, application or the observance of any provision of this Agreement."

gaining agreement. While nothing more is necessary to hold that arbitration is required, the union raises other claims which, on their faces, are governed by the collective bargaining agreement. For instance, the union alleges that the testing policy contravenes provisions in the collective bargaining agreements which regulate discipline of workers, seniority, leaves of absences, and reinstatement after a layoff.

Viewed in the light of the standards set out in Part II.A., there can be no question that the union's claims are arbitrable: the party seeking arbitration is making claims which on their faces are governed by the contract. Having determined this much, the federal court may go no further; an order compelling arbitration is required.[4]

### C. The Relevance of the Parties' Impasse

■ The company argues that as a result of the impasse in negotiations over a testing policy, the company had the right to implement the testing policy unilaterally. As far as it goes, the company's position is undoubtedly correct.

■ In order to promote industrial peace by fostering an atmosphere conducive to negotiations, the National Labor Relations Act ("NLRA") requires an employer to maintain the *status quo ante* after a collective bargaining agreement expires, at least as long as negotiations continue. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). If the parties reach an impasse in their negotiations, however, then the employer's statutory duty to maintain the *status quo ante* during postcontract negotiations comes to an end. *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n. 5, 108 S.Ct. 830, 833 n. 5, 98 L.Ed.2d 936 (1988). *See also NLRB v. Powell Elec. Mfg. Co.*, 906 F.2d 1007, 1011 (5th Cir.1990) (once an impasse occurs, company is privileged to implement

---

**4.** This case is readily distinguishable from *Ass'n of Chem. Employees v. E.I. DuPont de Nemours & Co.*, 701 F.Supp. 1282 (S.D.W.Va.1988), a case upon which the company relies heavily. In that case employees filed grievances challenging the company's unilateral implementation of a drug testing policy. The company refused to submit the grievances to arbitration. The district court refused to order the company to arbitrate. The key difference between that case and this one, however, is that in that case the claims made by the workers did not allege any violation of the collective bargaining agreement. The union there claimed that "(1) it [the testing policy] is an unreasonable invasion of privacy; (2) it violates the presumption of innocence; and (3) there is no evidence of drug abuse by [the] employees." 701 F.Supp. at 1287. This claim does not assert any violation of the collective bargaining agreement, and there was no arbitration provision which covered the dispute. Thus, the court had no basis on which to order arbitration.

A case more closely on all fours with this one—and one which is binding on this Court—is *Oil, Chemical & Atomic Workers Int'l Union, Local 4-447 v. Chevron Chem. Co.*, 815 F.2d 338 (5th Cir.1987). In that case the company conducted performance appraisals of two employees. The union filed a grievance asserting that the company's issuance of these appraisals violated a section of the collective bargaining agreement governing disciplinary actions against employees. *Id.* at 343. The company contended that the union's grievance was not

arbitrable because the performance appraisals were not provided for in the collective bargaining agreement and were not used in the disciplinary process, and therefore were not covered by the arbitration provision in the collective bargaining agreement.

The Fifth Circuit rejected this argument. The Court finds that there is a "grievance" in this case since the Union complained that Chevron violated Article XX, Section 1 which prevents Chevron from taking disciplinary actions for other than "just cause." A grievance is arbitrable, according to the collective bargaining agreement, if the grievance involves "the application or interpretation" of provisions in the collective bargaining agreement. Whether Chevron violated Article XX, Section 1 by administering the performance reports involves an "application" of that provision to the facts of this case.

*Id.*

In this case the company has not administered a performance report, but it is administering drug and alcohol tests which may be used to discipline employees. Indeed, the company has acknowledged that the testing policy changes the terms and conditions of employment. Certainly the question of whether the changes implemented by the company violate the collective bargaining agreement is a question which concerns the interpretation and application of the collective bargaining agreements at issue here. It thus becomes clear that this case is governed by our prior decision in *OCAW, Local 4-447*, and that arbitration is required.

unilaterally new terms of employment).[5] Thus, the company is quite correct that its unilateral implementation of a drug and alcohol testing policy did not violate the NLRA. This conclusion, however, goes only so far. It does not answer the question before this Court.

■ The question whether the company's unilateral implementation of a testing policy violated the NLRA is entirely separate from the question whether the disputes that have arisen out of the testing policy are arbitrable. The fact that unilateral implementation of the testing policy did not violate the NLRA says nothing about whether the arbitration clauses in the various collective bargaining agreements cover the grievances filed by each of the locals. Those grievances do not assert that implementation of the testing policy, in and of itself, was an unfair labor practice or a violation of the collective bargaining agreement. Rather, the grievances assert that the *terms* of the testing policy conflict with various terms of the collective bargaining agreements. The company cannot avoid arbitrating these grievances on the grounds that it did not violate the NLRA by unilaterally implementing a testing policy. The impasse reached on the issue of drug and alcohol testing does not diminish in any way the provisions in the collective bargaining agreements that require the company to arbitrate disputes regarding the application or interpretation of other provisions of the collective bargaining agreements.

## III. Conclusion

For the reasons stated, the judgment of the district court is reversed. Judgment is rendered in favor of the union; the company is ordered to submit to arbitration of the union's claims that its drug and alcohol testing policy violates the terms of the collective bargaining agreement.

REVERSED AND RENDERED.

WIENER, Circuit Judge, concurring in part, and dissenting in part.

I respectfully dissent from the majority opinion to the extent it holds arbitrable the reasonableness of the alcohol and drug abuse policy (the Policy) that was implemented unilaterally by the Company following execution of new collective bargaining agreements (CBAs), given that the Company and the Unions had bargained to impasse in good faith on the issue of the Policy during the course of the very collective bargaining that produced the CBAs.

The grievance and arbitration provisions contained in each of the new CBAs are not all-encompassing or unlimited. They only mandate arbitration of grievances that involve application or interpretation of some term or provision of the CBAs. It is axiomatic that, having bargained to impasse on the Policy so that no drug or alcohol testing provision is contained in the CBAs, the Policy is not a "term," not a "provision," and not in any way part of the CBAs. As such, the Policy itself, its reasonableness, its terms, its provisions and its conditions are not, in and of themselves, subject to being held up to scrutiny in arbitration by the Unions' invoking of the CBAs' grievance provisions.

It seems to me that the district court was squarely on target in finding that the Unions' efforts to use grievance-based arbitration to attack collaterally the extra-contractual Policy, which by impasse the Unions had failed to get included in the CBAs,

---

**5.** We recognize, of course, that any unilateral change imposed by the company after an impasse must be reasonably comprehended within the position taken by the company prior to the impasse. *See NLRB v. Tex–Tan, Inc.,* 318 F.2d 472, 481 (5th Cir.1963); *American Fed. of Television & Radio Artists v. NLRB,* 395 F.2d 622, 629–30 (D.C.Cir.1968). A unilaterally imposed change that is more generous to the employees than the position taken by the company prior to the impasse may demonstrate that the company was not negotiating in good faith, as it may have been willing to make further concessions. *Tex–Tan, Inc.,* 318 F.2d at 481, 481 n. 20.

It appears in the instant case that the testing policy implemented by the company was in fact the policy that the company had last proposed at the bargaining table. In this case, however, there is no issue regarding the parties' good faith in their negotiations, so this Court need not decide whether the policy implemented by the company was reasonably comprehended within its pre-impasse proposals.

amounts to "double dipping." As distinguished from bona fide employee grievances that might incidentally implicate the Company's administration of the Policy, the so-called grievances proffered in the instant case are at best thinly disguised guerrilla attacks on the entire Policy per se, its reasonableness and, in stark reality, the very right of the Company to adopt the Policy and implement it.

For the Company, the game is over as soon as the panel majority takes the Unions' "grievance" bait. It seems clear that here the Unions deliberately trumped up the purported grievances to have a foundation, however shaky, for its second "dip"— this time through the process of arbitration—after the first "dip" failed during the process of collective bargaining. This distinction should not have been ignored, but it must have been for the panel majority to reverse the district court which recognized the distinction so clearly.

This case simply is not about arbitrability of individual grievances that incidentally implicate some aspect of the Policy. Neither the Company nor I disagree with the underlying truism, stated both by the Unions and the panel majority, that bona fide employee grievances are arbitrable even though they may involve disciplinary action taken by the Company under the aegis of that Policy. But that issue is not at the heart of this case. Rather, this case probes the appropriate limits of CBAs, and their grievance and arbitration provisions, on matters like the Policy that have been affirmatively *excluded* from the CBAs by bargaining to impasse during the process of hammering out the contents of those contracts on the anvil of collective bargaining. And hovering just beneath the surface of that issue is the larger and more

omnipresent question at the core of most if not all labor disputes: Who will dominate and control the making and implementing of personnel policy, labor or management?

The presumption in favor of arbitrability,[1] however strong, is not universal, not without limits; it can never expand the aegis of arbitration beyond the finite extent to which labor and management have contracted to be amenable to that process. The arbitrability presumption is never properly used to force to arbitration an issue that the parties have not clearly agreed to arbitrate.[2] Here, the bargaining history of the CBAs in general and of the Policy in particular are "the most forceful evidence"[3] that the Company and the Unions never agreed to subject the Policy per se— particularly its overall reasonableness—to arbitration. Only provisions contained within the four corners of the CBAs are, by their very terms, appropriate grist for the arbitration mill; and impasse excluded the whole issue of a drug and alcohol abuse policy from the CBAs!

To the extent that the majority opinion in this case holds arbitrable those grievances arising from Company disciplinary actions which only incidentally implicate terms of the Policy, I concur—as, for that matter, did the Company in its brief to this court. But I do not agree that the Unions can merely wrap in the cloak of grievance their redundant effort to shoot down the post-impasse, extra-contractual Policy with a second shot—arbitration—after failing to bring it down with their first shot—collective bargaining. Substance, not form, controls the arbitrability vel non of any issue.[4]

Indeed, the majority opinion would ascribe to the Company the overly simplistic argument that, because its post-impasse implementation of the Policy does not vio-

---

**1.** *See AT & T Technologies, Inc. v. Communication Workers,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986).

**2.** *United Steel Workers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *In re Talbott Big Foot, Inc.,* 887 F.2d 611, 614 (5th Cir.1989).

**3.** *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1353–54.

**4.** *See Iowa Beef Processors, Inc. v. Amalgated Meatcutters & Butcherworkmen,* 627 F.2d 853, 856 (8th Cir.1980); *Radio Corp. of America v. Association of Scientists & Professional Engineering Personnel,* 414 F.2d 893, 896 (3rd Cir. 1969); *Independent Petroleum Workers v. American Oil Co.,* 324 F.2d 903, 906–07 (7th Cir.1963), *aff'd by equally divided Court,* 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964).

late the NLRA, disputes arising out of the Policy are not arbitrable. My reading of the Company's brief to this court, and my recollection of the Company's position at oral argument, eschew any such ascription. Ironically, it was the Unions first, and the panel majority second, who created that flawed leap of logic in order to refute it. It is they who invoke the legal duty to maintain the *status quo ante*, and the contractual duty of the Company to implement "reasonable" safety regulations, to reach the conclusion that the Unions' proffering of the so-called grievances here is somehow *not* an impermissible collateral attack on the implementation and reasonableness of the Policy. The procedural history of this case and the nature of the "grievances" proffered make it clear, at least to me, that in reality the efforts of the Unions to subject the Policy to arbitration orchestrate precisely such a renewed attack, and are thus accurately characterized by the district court as attempts to "double dip" the issue.

The nub of my dissent is the acceptance by the panel majority of the Unions' means of getting a proverbial second bite at the apple, this time through arbitration under the guise of arbitrable grievances. I therefore respectfully dissent from the ultimate result of the majority opinion, allowing the Unions' cynical use of the CBAs' grievance provisions to gain a full, de novo examination by the arbitrator of the reasonableness of the Policy vel non when arbitration is a method of dispute resolution properly limited to those issues contractually submitted to it via the collective bargaining contracts. Here, precisely the opposite occurred: By impasse the parties to those contracts excluded the Policy from the CBAs and thus from arbitration.