**TEXAS CITY METAL TRADES COUNCIL, AFL–CIO,**
Plaintiff,

v.

**UNION CARBIDE CORPORATION,**
Defendant.

No. CIV.A. G–03–715.

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 18, 2004.

Byron Miles Buchanan, Williams Bailey Law Firm, Houston, TX, for plaintiff.

Joseph G. Galagaza, Seyfarth Shaw, Houston, TX, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff Texas City Metal Trades Council, AFL–CIO ("Plaintiff" or "the Union") and Defendant Union Carbide Corporation ("Defendant" or "the Company") each seek summary judgment in this lawsuit brought by the Union to enforce the arbitration provisions of the collective bargaining agreement between the Parties. For the reasons stated below, the Union's Motion for Summary Judgment is hereby respectfully **DENIED**, and the Company's Motion for Summary Judgment is hereby **GRANTED**.

## I. Background and Facts

The Company owns a facility in Texas City, Texas, at which a number of the Union's members work. The Parties' previous collective bargaining agreement expired on April 12, 2002. Negotiations for a new contract began in March 2002, but the Parties did not reach an agreement before their previous contract expired. At a meeting held on December 11,2002, The Union put the Company on notice that it would call a strike if the Parties failed to reach an agreement.

The Company's negotiator, Les Uhlmann, asked the Union to have its members vote on the Company's "last, best, and final offer." See Deposition of Jesse J. Sanchez, Defendant's Motion for Summary Judgment, Exh. B, at 27:21–25. Uhlmann asked if there was anything the Company could do to encourage bargaining unit members to ratify the agreement. See id. at 27:25–28:2. Jesse Sanchez, the Union's negotiator, made two suggestions. First, he asked for assurances that the Company would not file an RM petition with the National Labor Relations Board to seek decertification of the Union during the term of the contract. See id. at 28:2–6. Uhlmann agreed to this condition. Id. at 28:6. Second, Sanchez raised the possibility of severance packages for members of the bargaining unit. Id. at 28:12–29:9. The parties agreed to discuss a possible severance package for employees. Id. at 29:5–8. Uhlmann and Sanchez signed a letter of understanding, which provided:

If the Company's Last and Final offer currently on the table is ratified by the Union Membership prior to December 18th, the Company will:

— agree that during the term of the 10 year collective bargaining agreement not to file an R M Petition with the National Labor Relations Board requesting an election to determine whether or not the Union has majority support of the employees.

— agree to enter into discussions with the Union regarding a possible severance agreement for bargainedfor employees with no commitment that a severance agreement will be reached and either party shall retain the right to stop discussions on this subject at any time.

Cover Letter of Understanding to Company's Last and Final Offer (Dec. 11,2002), Defendant's Exh. 7.

The Parties ratified a new collective bargaining agreement, which became effective on December 18, 2002 ("the CBA"). *See* Plaintiff's Motion for Summary Judgment, Exh. 1. On the effective date of the CBA, Sanchez sent Uhlmann a written request for a meeting to discuss the details of "a possible severance package agreement" for members of the bargaining unit. Letter from Jesse J. Sanchez, Business Manager, Texas City Metal Trades Council, to Les Uhlmann, Human Resources Leader, Dow Chemical Co. (Dec. 18, 2002). The Parties met on December 19, 2002 to discuss possible severance benefits. At the meeting, Uhlmann told the Union that there would be no limit to the number of maintenance employees who could accept the severance package. On December 20, 2002, the Parties entered into a written Side Agreement concerning severance benefits for maintenance employees. *See* Side Agreement (Dec. 20, 2002), Defendant's Exh. 9.

The Company also offered a number of severance packages to the operations department employees in the bargaining unit, but on the condition that five to eight operators selected by the Company would be included in the list of employees slated to receive the severance packages.[1] In exchange, the Company would offer additional severance packages to approximately fifteen other operators based on seniority. On December 20,2002, Sanchez informed Uhlmann that the Union was not interested in the severance offer for the operators. *See* Sanchez Depo. at 48:20–49:8. The Parties never reached an agreement concerning severance packages for operators, and the Company did not implement any severance plan for that group of employees. 51:24–52:13.

In January 2003, Eddie Evans, an African American union steward and operator, filed Grievance No. 745, upon which this lawsuit is based. In the space marked "Statement of Employee Grievance" on the grievance form, Evans wrote:

> Listing my name as a "selected operator." Racial discrimination & color along with retaliation. Dow management intentionally single out & scapegoat certain people. I've been one of those people for some time because of my race & color.

Texas City Metal Trades Dow Chemical Company/Union Carbide Corp. Grievance Form, Plaintiff's Exh. 3 ("the Grievance"). In the space marked "Contract Provision Relied Upon or Claimed Violated," Evans wrote:

> Contract clause. Discrimination (equal treatment for (members)). All state & federal laws that govern discrimination including 1964 Civil Rights Act.

*Id.* In the "Remedy Requested" section, Evans wrote:

> Patterns to conspire against me exist. Whatever legal remedy is necessary. Also include those who can influence within the law in America decisions to stop racism, retaliation & discrimination. Your last investigation on my harassment charge was bias as well.

*Id.* Sanchez amended the Grievance on February 27, 2003, to include two additional employees—Armando Victoria and Steve Burns. Sanchez amended the Grievance again on May 16, 2003, to add the word "Seniority" to the space marked "Contract Provision Relied Upon," and to request that the severance packages of-

---

1. The Union refers to this list as "the Hit List" and alleges that the employees who were "targeted" by the Company were outspoken on union issues or participated in union activities.

fered to maintenance employees be offered to the operators. *See id.;* Sanchez Depo. at 19:5–20:13.

Evans's supervisor denied the Grievance on January 12, 2003. After the Union attempted to process the Grievance through the CBA's grievance and arbitration procedures, the Company informed the Union in writing that it would not process the matter to arbitration. *See* Letter from Gary Deehan, Human Resources, to Jesse J. Sanchez (March 4, 2003), Plaintiff's Exh. 4 (objecting to further processing of the Grievance "because it is untimely and outside the contract grievance-arbitration process as outlined in Article 34"). Following the Company's refusal to process the matter to arbitration, the Union filed this lawsuit under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a)("LMRA"), seeking to compel the Company to arbitrate the Grievance. On June 29, 2004, the Parties filed cross-motions for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When one party moves for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts

that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## III. Analysis

■ In the so-called *Steelworkers Trilogy,* the Supreme Court established four guiding principles of arbitration. *See Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *see also AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (outlining and reaffirming the principles established in the *Steelworkers Trilogy*). First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Oil, Chem. & Atomic Workers' Int'l Union, Local 4–447 v. Chevron Chem. Co.,* 815 F.2d 338, 340 (5th Cir.1987) (quoting *Warrior & Gulf,* 363 U.S. at 582, 80 S.Ct. at 1352). Second, the courts are the appropriate forum in which to decide whether the parties agreed to arbitrate. *Id.* (citing *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53). Third, in considering whether a grievance is subject to arbitration, courts

must avoid consideration of the merits of the grievance. *See Id.* at 343 ("The court's function is to decide whether the claim asserted is the type of claim which the parties have agreed to arbitrate. In no way are the courts to consider the merits of a party's claim."). The only question is whether the Grievance is within the scope of the arbitration clause in the collective bargaining agreement. Finally, all doubts should be resolved in favor of arbitrability. *Id.* at 340.

■ Although the Court must not consider the merits of the Grievance, it must make a reasonable inquiry into the character of the Grievance to determine whether it comes within the scope of the Parties' arbitration agreement. *See Int'l Union of Operating Eng'rs v. Sid Richardson Carbon Co.,* 471 F.2d 1175, 1178 (5th Cir.1973) (holding that courts may consider the parties' bargaining history to determine the scope of the arbitration agreement); *Phillips Petroleum Co. v. Int'l Bhd. of Boilermakers,* 251 F.Supp.2d 1354, 1359 (S.D.Tex.2003) (considering the bargaining history of the parties, side agreements, and the collective bargaining agreement's silence with regard to the disputed performance incentive plans); *see also Contra Costa Legal Assistance Workers v. Contra Costa Legal Servs. Found.,* 878 F.2d 329, 330 (9th Cir.1989) (noting that courts must review "the specific language of the collective bargaining agreement *and* the facts alleged in the grievance"). A party "must not be allowed to create an arbitrable issue where none exists simply by 'couching' its grievances in terms of the collective bargaining agreement." *Steelworkers v. AS-ARCO, Inc.,* 970 F.2d 1448, 1451 (5th Cir. 1992).

Generally speaking, the Court must determine whether the Parties have agreed to arbitrate this dispute. *See Chevron,* 815 F.2d at 343. The scope of the Parties' agreement is outlined by the language of the arbitration clause. The Court must therefore determine whether the Company's alleged wrongful conduct constitutes "interpretation or application" of the terms of the CBA. *See CBA Art. 34, Section 1, at 39.

Article 34, section 1 of the CBA provides that "any dispute, complaint, or grievance, except those pertaining to discharge as outlined in Section III of this Article, arising out of interpretation or application of the terms of this agreement" shall be subject to the grievance procedures outlined in Article 34 of the CBA. *See CBA Art. 34, Section 1, at 39. Under Step One of the grievance procedure, an employee must discuss any grievance with his or her supervisor, and the supervisor must render a verbal answer within five days. *See id.* If the grievance is not settled in Step One, it may be appealed to Step Two by the Union's Business Manager, who must present the appeal in writing to the Company's human resources department within ten days. *See id.* Art. 34, Section 1, at 40. If the grievance is not settled in Step Two, it may be appealed to arbitration. *See id.* Art. 34 Section 2, at 40.

The Union contends that the Grievance is subject to arbitration because it contains an allegation that the Company's conduct [2] violated the anti-discrimination and seniority provisions of the CBA. Because the Grievance alleges violation of specific provisions of the CBA, the Union argues that "the face of the Grievance states a violation of the CBA subject to the grievance

---

**2.** Although the Union's Motion for Summary Judgment does not specify particular conduct, the Court assumes that the grievance is based on either (1) the offer of an allegedly discriminatory severance package or (2) the withdrawal of that offer and the resulting failure to enter into a severance agreement with the operators.

and arbitration provisions contained therein." Plaintiff's Motion at 2.

The Company argues that the Union is not entitled to arbitration because the Grievance does not implicate the arbitration provisions of the CBA. It points to the grievance and arbitration provisions of the CBA, which require an "interpretation or application of the terms of" the CBA. CBA Art. 34, Section 1, at 39. Undisputed facts in the record show that no severance plan for operating employees was ever put into effect. *See* Deposition of Eddie Evans, Defendant's Motion for Summary Judgment Exh. A, at 63:18–64:11; Sanchez Depo. at 65:8–19. Because the proposed severance package never became a part of the CBA, the Company maintains that the severance package and the related negotiations, which form the basis of the Grievance, are not subject to the CBA's arbitration provisions.

In *United Steelworkers of America v. ASARCO, Inc.*, Asarco proposed a drug and alcohol testing policy during collective bargaining. *See ASARCO*, 970 F.2d at 1449. Although they reached a collective bargaining agreement, the parties failed to reach an agreement on a drug and alcohol testing policy. Three months after the collective bargaining agreement took effect, Asarco unilaterally imposed a mandatory testing policy. *See id.* at 1449–50. The company justified the drug policy as a health and safety regulation *Id.* at 1452. The union alleged that the drug policy was unreasonable and therefore violated a provision in the collective bargaining agreement that obligated the company to "make reasonable provisions for the safety and health of its employees." *Id.* The Fifth Circuit determined that because the collective bargaining agreement imposed a duty to make reasonable health and safety provisions, the union's grievance arose out of the application of the agreement, and the

dispute was subject to arbitration. *Id.* at 1451–52 ("Given that the company itself has characterized the policy as a health and safety regulation, an allegation that the policy is unreasonable is properly read as alleging that the policy violates the collective bargaining agreement.").

Similarly, in *Oil, Chemical & Atomic Workers International Union v. Phillips 66 Co.*, 976 F.2d 277 (5th Cir.1992), Phillips and the union negotiated but failed to agree on a drug and alcohol testing policy. After the union refused the company's "best and final offer," Phillips unilaterally implemented a new drug policy. *Phillips*, 976 F.2d at 278. The union filed a grievance alleging that the policy violated provisions of the agreement governing discharge without just cause, health and safety, and the recognition clause. *See id.* The Fifth Circuit followed *ASARCO*, holding that the grievance was arbitrable because it violated the terms of the agreement. *Id.* at 279.

■ *ASARCO* and *Phillips* thus illustrate the rule that in order to establish that a company has interpreted or applied a collective bargaining agreement, the union must show that the company has taken some action to carry out a specific obligation imposed by the agreement. This case is distinguishable from *Phillips* and *ASARCO* because the Grievance does not arise out of any final action on the part of the Company. The Parties agree that no severance package was ever put in place for operations employees, and none of the individuals listed on the Grievance were forced to accept a severance package. *See* Sanchez Depo. at 65:8–19. Furthermore, the Union does not identify any provision of the CBA that governs conduct during negotiations or obligates the Company to grant severance packages to certain employees.

■ The current dispute arises out of the joint efforts of the Company and the

Union to *determine* the terms of their agreement. It does not arise out of the application or interpretation of the terms of their previously ratified agreement—the CBA. The notion that failure to agree on a subject external to the CBA comes within the scope of the CBA's arbitration clause lacks any support in the terms of the CBA or the law governing arbitration. The Union correctly notes that the face of the Grievance alleges a violation of the CBA, but the Grievance does not state that these alleged violations arose out of the interpretation or application of the CBA itself. The Union's attempt to compel arbitration of an issue left undecided after ratification of the CBA is no more than an attempt to bootstrap the Grievance into arbitration by alleging that the Company's failure to reach an agreement violated the anti-discrimination principles of the CBA. But the fact remains that the subject matter of the Grievance is not covered by the CBA. Because the CBA does not address the Parties' negotiation of severance packages, the conduct on which the Grievance is based does not qualify as "interpretation or application" of the terms of the CBA. Accordingly, the Union is not entitled to arbitrate the Grievance.

IV.  Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment is hereby respectfully **DENIED**, Defendant's Motion for Summary Judgment is hereby **GRANTED**, and Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**. Each Party is to bear its own taxable costs, attorneys' fees, and expenses incurred herein to date. A Final Judgment will issue with this Order.

**IT IS SO ORDERED.**